METRO EAST CENTER FOR CONDITIONING AND HEALTH, Individually and Behalf of All Others Similarly Situated, Plaintiffs,

v.

QWEST COMMUNICATIONS INTERNATIONAL, INC., Defendant.

No. 01–CV–0399–DRH.

United States District Court, S.D. Illinois.

Jan. 28, 2002.

Steven A. Katz, Douglas R. Sprong, Diane M. Heitman, Carr, Korein et al., Swansea, IL, Jimmie R. Phagan, Dallas, TX, for plaintiff.

Glenn E. Davis, Armstrong Teasdale LLP, St. Louis, MO, Steven M. Dunne, Scott F. Llewellyn, Brigida Benitez, Wilmer, Cutler et al., Washington, DC, for defendant.

### MEMORANDUM AND ORDER

HERNDON, District Judge.

### I. Introduction

On June 18, 2001, Metro East Center for Conditioning and Health filed suit against Qwest Communications, alleging that Qwest has been charging it a presubscribed inter exchange carrier charge ("PICC") in violation of a Federal Communications Commission regulation, 47 C.F.R. § 69.153, and in excess of the appropriate rate as set forth in Qwest's FCC tariff (Doc. 1). On August 20, 2001, Qwest filed a motion to dismiss this action asserting that the FCC has primary jurisdiction over this case because Metro East seeks application and interpretation of a FCC regulation (Doc. 17). On September 13, 2001, Metro East voluntarily dismissed Count I of its Complaint which alleges a violation of a FCC regulation (Doc. 33). Therefore, Metro East now only alleges that the PICC charged is in excess of the rate set forth in Qwest's tariff. After Metro East voluntarily dismissed Count I of its Complaint, Qwest sent a letter to Metro East indicating its intent to invoke the "tariff provision requiring arbitration." Consequently, Metro East filed a "motion for the declaration of the inapplicability/unen-

forceability of arbitration clause" (Doc. 32) and Qwest filed a motion to compel arbitration (Doc. 34). On January 18, 2002, the Court held a hearing on these motions and took the matter under advisement. The Court now finds that Metro East's claim is not subject to arbitration and that Qwest's motion to dismiss must be denied.

## II. *Analysis*

### A. *Arbitration*

Qwest's tariff, filed with the FCC, contains an arbitration clause which requires that:

> Any claim, controversy or dispute, whether sounding in contract, statute, tort, fraud, misrepresentation, or other legal theory, related directly or indirectly to the Services, whenever brought and whether between the Company and the Customer or between the Company or the Customer and its employees, agents or affiliated businesses of the other party, shall be resolved by arbitration as prescribed in this section. The Federal Arbitration Act, 9 U.S.C. § 1–15, not state law, shall govern the arbitrability of all claims.

(Doc. 37, Exh. A). Qwest, therefore, argues that Metro East's claim is subject to mandatory arbitration. In response, Metro East argues that the arbitration clause contained in Qwest's tariff is unenforceable because it is not a "written agreement to arbitrate" as required by the FAA.[1]

▮▮▮ Qwest's tariff provides that the Federal Arbitration Act "shall govern the *arbitrability* of all claims." (Doc. 37, Exh. A)(emphasis added). The Court must, therefore, turn to the FAA to determine whether Metro East's claim is arbitrable. Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. Therefore, in order to stay proceedings pursuant to section 3, the movant must satisfy two conditions: (1) the issue must be referable to arbitration under a written agreement to arbitrate and (2) the movant must not be in default in proceeding with arbitration. *Merit Ins. Co. v. Leatherby Ins. Co.*, 581 F.2d 137, 142 (7th Cir.1978). Although national policy encourages arbitration of disputes, submission to arbitration is consensual, not coercive. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Thus, a court cannot force a party to arbitrate unless that party has entered into a contractual agreement to do so. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

The need for an agreement as a condition to gaining access to the provisions of the FAA manifests itself through various

---

1. Metro East also advances several arguments challenging the validity of the tariff's arbitration provision. Qwest argues that the Court cannot entertain Metro East's challenges to the *validity* of the arbitration clause because a court cannot modify or invalidate the terms of a tariff. *Arsberry v. Illinois,* 244 F.3d 558, 562 (7th Cir.2001). Regardless of whether Qwest is correct in its assertion, the Court need not address Metro East's challenges to the validity of the arbitration provision because the issue can be resolved upon the plain reading of the Federal Arbitration Act and Qwest's tariff.

provisions of the Act. Section 2 of the FAA provides that "[a] written provision in any ... contract, or an agreement in writing to submit to arbitration," is valid and enforceable "save upon such grounds as exist at law or equity for the revocation of any contract." 9 U.S.C. § 2. Similarly, section 4 states that "[i]f the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. From this review, "it is apparent that determining whether there was a written agreement to arbitrate the controversy in question is the first and crucial step in any enforcement proceeding before a district court." *MCI Telecommunications Corp. v. Exalon Indus., Inc.*, 138 F.3d 426, 429 (1st Cir.1998). In order to determine whether the parties intended to submit to arbitration, a court reviews the contract (if any) at issue. *See AT & T Technologies v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). In doing so, the court looks to contract law. *Mastrobuono*, 514 U.S. at 57, 62, 115 S.Ct. 1212. Therefore, it is necessary to show a manifestation of mutual assent or a meeting of the minds. *Interstate Indus., Inc. v. Barclay Indus., Inc.*, 540 F.2d 868, 870–71 (7th Cir.1976).

■ In this case, there was no contract between Qwest and Metro East. The arbitration clause at issue is contained in a tariff filed with the FCC. The unilateral and nonnegotiable nature of a tariff filed with the FCC negates any contention that a tariff constitutes an "agreement" between parties. Qwest has repeatedly and correctly asserted that a tariff is *not* a

contract. *MCI Telecommunications Corp. v. Graham*, 7 F.3d 477, 479 (6th Cir.1993). It cannot now argue that the arbitration clause contained in the tariff is part of a contract by which the parties agreed to arbitrate.[2]

Qwest also argues that under the filed-rate doctrine, its valid tariff, filed with the FCC, "conclusively and exclusively controls the rights and liabilities between a carrier and its customer." *Graham*, 7 F.3d at 479. Therefore, Qwest argues, it does not matter that Metro East did not assent to the particular terms of the tariff. Even assuming that Qwest is correct in arguing that its tariff conclusively controls the rights and liabilities of the parties, Qwest's tariff requires that the FAA "govern the *arbitrability* of all claims," and the FAA requires a written agreement to arbitrate. *Exalon Indus.*, 138 F.3d at 429. An "agreement" presupposes a mutual assent to the terms. *Interstate Indus.*, 540 F.2d at 870–71. Under the analysis above, the arbitration clause in Qwest's tariff does not constitute a written agreement to arbitrate. The Court, therefore, finds that Qwest and Metro East clearly did not enter into a contractual agreement to arbitrate. Accordingly, the Court GRANTS Metro East's "motion for the declaration of the inapplicability/unenforceability of arbitration clause" (Doc. 32) and **DENIES** Qwest's motion to compel arbitration (Doc. 34).

#### B. *Motion to Dismiss*

■ Qwest filed a motion to dismiss this action asserting that the FCC has

---

**2.** Qwest relies upon two district court cases to argue that the arbitration clause contained in its tariff is enforceable. *Pay Phone Concepts, Inc. v. MCI Telecommunications Corp.*, 904 F.Supp. 1202 (D.Kan.1995); *MCI Telecommunications Corp. v. Happy the Glass Man, Inc.*, 974 F.Supp. 1016 (E.D.Ky.1997). These cases are inapposite. First, district court cases are not binding on this Court. Moreover, both cases are distinguishable from the case at bar. In both *Pay Phone* and *Happy the Glass Man*, the tariff's arbitration provision was expressly incorporated by reference into a prior written agreement between the parties. *Id.*

**730**

primary jurisdiction over Metro East's claims. The doctrine of primary jurisdiction should be applied when the complaint raises a question of the validity of a rate or practice included in a tariff filed with an agency, particularly when the issue involves technical questions of fact uniquely within the expertise and experience of an agency. *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). However, claims brought asserting that the tariff (fair on its face) has been violated are properly brought before a court, not an administrative agency. *Pennsylvania v. Puritan Coal Mining Co.*, 237 U.S. 121, 131–32, 35 S.Ct. 484, 59 L.Ed. 867 (1915). In its motion to compel arbitration and during oral argument, Qwest conceded that because Metro East now only claims that Qwest violated its tariff, the FCC does not have primary jurisdiction over this action. Qwest, however, argues that to the extent that Metro East challenges the *validity* of the arbitration provision contained in the tariff, the FCC does have primary jurisdiction over that issue. Because the Court finds that, under a plain reading of the FAA and Qwest's tariff, the parties did not enter into a written agreement to arbitrate, Metro East's challenges to the *validity* of the arbitration clause are moot as is Qwest's motion to dismiss. Accordingly, the Court **DENIES** Qwest's motion to dismiss (Doc. 17).

### III. *Conclusion*

The Court **GRANTS** Metro East's "motion for the declaration of the inapplicability/unenforceability of arbitration clause" (Doc. 32), **DENIES** Qwest's motion to compel arbitration (Doc. 34), and **DENIES** Qwest's motion to dismiss (Doc. 17). Further, because the allegations and circumstances of this case have changed since Metro East filed its motion for class certi-

fication, the motion is **DENIED at this time** (Doc. 2), with leave to re-file.

**IT IS SO ORDERED.**