In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-1359

METRO EAST CENTER FOR CONDITIONING AND HEALTH,

*Plaintiff-Appellee,*

*v.*

QWEST COMMUNICATIONS INTERNATIONAL, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 01-CV-0399-DRH—**David R. Herndon**, *Judge.*

ARGUED JUNE 6, 2002—DECIDED JUNE 27, 2002

Before EASTERBROOK, MANION, and KANNE, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* When Metro East Center for Conditioning and Health chose a new vendor for local phone service, it neglected to name an interstate carrier, so one was assigned at random—Qwest Communications, which played that role for six months (February through July 2001) before Metro East specified a different carrier. Qwest's tariff on file with the Federal Communications Commission had two pertinent provisions: First, it set the monthly minimum fee per line (the "presubscription charge") that each customer must pay; second, it provided

that any dispute would be resolved by arbitration. (We use the past tense because the tariff was canceled on July 31, 2001, as part of the FCC's detariffing program. Today Qwest uses a published statement of rates and rules, which presumably may be varied by customer-specific contracts. But the tariff was in force when the parties' dispute arose and thus governs its resolution.) Metro East contends that it uses Centrex service so that the monthly fee was 45¢ per line; Qwest believes that Metro East is not a Centrex user and that the tariff therefore specified a monthly charge of $4.25. The total in contention is about $80, and the simplified procedures of arbitration are especially attractive for small-stakes disputes. But Metro East believes that the controversy is *so* small that neither arbitration nor ordinary litigation makes sense. It filed this suit seeking to represent a class of all customers who qualify for but did not receive the 45¢ monthly rate under the tariff. Qwest replied with a motion to dismiss the suit and compel arbitration.

Qwest's Interstate Tariff No. 3 says, among other things:

> Any claim, controversy or dispute, whether sounding in contract, statute, tort, fraud, misrepresentation, or other legal theory, related directly or indirectly to the Services, whenever brought and whether between the Company and the Customer or between the Company or the Customer and the employees, agents or affiliated businesses of the other party, shall be resolved by arbitration as prescribed in this section. The Federal Arbitration Act, 9 U.S.C. §§ 1-15, not state law, shall govern the arbitrability of all claims.

Under §3 of the Federal Arbitration Act, 9 U.S.C. §3, only the parties' "agreement" supports arbitration. Yet a tariff is a set of terms created and filed unilaterally by a carrier. Customers do not "agree" to these terms, though they are binding unless the federal agency with which they have

been filed disapproves them. See, e.g., *AT&T v. Central Office Telephone, Inc.*, 524 U.S. 214 (1998); *Cahnmann v. Sprint Corp.*, 133 F.3d 484 (7th Cir. 1998). No private agreement can displace a tariff's terms. See *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116 (1990). Because the Federal Arbitration Act makes an "agreement" essential, the district court concluded, Qwest's customers need not arbitrate any dispute with it. 182 F. Supp. 2d 726 (S.D. Ill. 2002). The order denying Qwest's motion to compel arbitration is immediately appealable under 9 U.S.C. §16(a)(1)(B).

The district court's approach has a "gotcha!" quality: The clause requiring arbitration refers to the Federal Arbitration Act and as a consequence precludes arbitration. Yet it is almost never right to read legal language as self-defeating. The district judge understood the clause as saying: "Every dispute must be arbitrated, provided, however, that no dispute is arbitrable." Why would someone put such a clause in a tariff, a contract, or any other document? People draft documents to achieve *some* objective, and although the meaning of words can be elusive even after taking into account both linguistic and economic contexts, see *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856 (7th Cir. 2002), and some words may turn out to be redundant or otherwise carry no weight, it is not sensible to construe a substantial passage of a legal text as pointless. When one sentence seems to cancel out the rest of a subsection, it is essential to ask whether that sentence *must* devastate its surrounding language. Is there no alternative reading of either the contract or the Arbitration Act that will enable the whole clause to survive?

It isn't hard to think of one: An "agreement" for purposes of §3 means no more than an offer and acceptance that produces a legally binding document. Tariffs, like contracts, have that quality. The tariff is an offer that the customer accepts by using the product. The terms have legal effect;

indeed, by virtue of federal law a tariff is more conclusive than a contract and is said to have the status of a regulation, see *Cahnmann*, 133 F.3d at 488, though a tariff also may be enforced through suit just as a contract may be enforced. No surprise that we have referred to tariffs as a species of contract. See, e.g., *Arsberry v. Illinois*, 244 F.3d 558, 562 (7th Cir. 2001). Accord, *Atlantic & Gulf Stevedores, Inc. v. Alter Co.*, 617 F.2d 397, 401 n.16 (5th Cir. 1980); *Penn Central Co. v. General Mills, Inc.*, 439 F.2d 1338, 1340 (8th Cir. 1971). Tariffs differ from private contracts only to the extent that they are not subject to alteration one customer (or one clause) at a time or to nullification by a court on grounds such as unconscionability. Instead a tariff must be enforced as written unless the regulatory agency intervenes. Metro East supposes that to form an "agreement" with Qwest it must engage in individual negotiation, clause by clause. A tariff is a take-it-or-leave-it proposition and thus not an "agreement" by these lights. Yet we have held that form contracts, offered on a take-it-or-leave-it basis, are agreements for purposes of the Arbitration Act. See, e.g., *Koveleskie v. SBC Capital Markets, Inc.*, 167 F.3d 361 (7th Cir. 1999); *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997). Cf. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991) (enforcing a forum-selection clause included among three pages of terms attached to a cruise ship ticket). Tariffs are no different on this dimension.

Arbitration often comes with the territory, so to speak—for example, with a job or with membership in the National Association of Securities Dealers. See, e.g., *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995); *J.E. Liss & Co. v. Levin*, 201 F.3d 848 (7th Cir. 2000). Although these requirements may be non-negotiable—one cannot join the NASD without accepting its arbitration regimen, and often an investor cannot trade securities *through* NASD mem-

bers without committing to arbitrate—they remain "agreements" because the person could have chosen to do something else. A would-be securities dealer may elect a different occupation; by making a living at securities trading he agrees to live by the rules applicable to securities dealers. Likewise a business such as Metro East that wants to make interstate phone calls can shop among tens of rivals for the best combination of price and terms. If customers value the ability to litigate by more than the incremental cost of litigation compared with arbitration, then one or more of the carriers will offer that option. Even if none does, the price the carriers charge in competition will reflect the terms of the transaction.

So this tariff does not suffer from a self-inflicted wound. Metro East has "agreed" to arbitrate within the meaning of §3. Nonetheless, Metro East insists, it should be entitled to litigate because arbitration is too expensive for an $80 dispute (the filing fee alone is greater), because arbitrators need not entertain class actions, and so on. This is the sort of litany that the Federal Arbitration Act is supposed to silence; arbitration has disadvantages compared with litigation but has benefits too, and private parties are entitled to choose in order to maximize their own satisfaction. An arbitral forum can serve as a sort of small-claims tribunal in a way that a federal district court cannot. If arbitration offers benefits to Qwest and detriments to customers such as Metro East, these benefits are reflected in a lower cost of doing business that in competition are passed along to customers. There is *lots* of competition in interstate telecommunications service. Customers therefore are compensated through lower rates for any net loss they may experience in arbitration. They can't accept the lower rates (recall that Metro East contends that it is entitled to an especially favorable fee of 45¢ per line per month) while avoiding the means that made lower rates possible.

What is more, arbitration may offer net benefits to all concerned. The filing fee for arbitration exceeds the stakes of this $80 dispute—but so does the filing fee for litigation in a federal district court, and the discovery procedures of litigation may be more expensive for both sides than are the procedures used in arbitration. Qwest's tariff calls for arbitration under the auspices of the American Arbitration Association, using its expedited procedures without discovery. This curtails the cost of the proceedings and allows swift resolution of small disputes on written submissions. A firm such as Metro East can provide documents (from itself or its local carrier) supporting its contention that it has Centrex service without opening itself to expensive discovery. This seems to give the customer the upper hand: without discovery, Qwest would not find it easy to meet Metro East's proof about the nature of its phone switch.

None of this matters, however, because the decision is not ours to make. Under the Arbitration Act, expressly incorporated into the tariff, an agreement to arbitrate must be enforced to the same extent as any other contract would be enforced. Metro East does not contend that any legal rule would nullify terms of the tariff viewed as ordinary contractual clauses. 9 U.S.C. §2. To the extent that Metro East argues that arbitration is unfair or unjust because it interferes with some other federal objective—the sort of argument offered by four Justices in dissent in *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79 (2000)—it runs smack into the filed-rate doctrine (sometimes called the filed-tariff doctrine because it covers terms as well as rates). It is the regulatory agency (here the FCC) that possesses exclusive authority to set aside rates, terms, conditions, and other ingredients of a tariff. By incorporating the Federal Arbitration Act, the tariff authorizes the court to decide whether a dispute is arbitrable under §3 (as we have done); this role does not offend the filed-tariff doctrine because the tariff itself commands application of the Arbi-

tration Act's standards. But any broader claim, such as that arbitration is an inappropriate practice in the telecommunications business or transgresses some aspect of the federal statutes that the FCC administers, is an argument for the FCC alone. A customer who objects to any part of a tariff may ask the FCC to suspend or annul the tariff and is entitled to judicial review of an unfavorable decision. 47 U.S.C. §§ 204(a)(2)(C), 402. But Metro East has not initiated an administrative proceeding—and Qwest informed us at oral argument that none of its other customers has sought administrative review of the arbitration requirement nor, to its knowledge, has *any* customer of *any* carrier protested before the FCC *any* arbitration provision in a telecommunications tariff. This suggests that most customers find arbitration a valuable cost-saver; certainly it affords no reason to suppose that the FCC thinks arbitration improper and just hasn't got 'round to purging it from Qwest's Interstate Tariff No. 3.

Metro East relies heavily on *McCaskill v. SCI Management Corp.*, 285 F.3d 623 (7th Cir. 2002), for the proposition that an arbitration clause is invalid if the parties' agreement includes a provision for the allocation of attorneys' fees at variance with otherwise-applicable law. According to Metro East, *McCaskill* held an arbitration agreement covering employment disputes invalid because it adopted the American Rule under which each side bears its own legal expenses, see *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975), while Title VII of the Civil Rights Act of 1964 creates a fee-shifting regimen allowing a prevailing employee to recover legal fees from the employer. See *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978). This approach applies here, Metro East contends, because the Federal Communications Act provides for fee shifting, 47 U.S.C. §206, while Qwest's tariff specifies use of the American Rule. Metro East overstates *McCaskill*'s holding, because the employer in that case

*conceded* that the American Rule would not be used in the arbitration and forfeited additional arguments as well. The employer did not, for example, contend in *McCaskill* that it is the arbitrator, not a judge, who must determine in the first instance what rules for the allocation of legal expenses are applicable. Although some language in *McCaskill* could be read to decide issues on which the parties had not engaged, rehearing has been granted in that case to consider more fully the effects of the employer's forfeitures. Because *McCaskill* has been withdrawn, it remains open to decision in this circuit whether parties to a contract may agree to replace a fee-shifting system with the American Rule, whether the right party to make this decision is the arbitrator or the judge, and whether, if a contractual choice of the American Rule is indeed forbidden, this spoils the entire arbitration clause.

As far as we know, the Supreme Court has never held that *any* entitlement is outside the domain of contract, unless the statute forbids waiver (as §206 of the Communications Act does not). Every day criminal defendants waive the most fundamental rights, such as the right to jury trial and proof beyond a reasonable doubt, in exchange for lower sentences or other benefits. See *United States v. Krilich*, 159 F.3d 1020 (7th Cir. 1998) (collecting authority). Public employees can and do waive constitutional rights—including the right of political speech—in exchange for employment. See, e.g., *CSC v. Letter Carriers*, 413 U.S. 548 (1973); *Snepp v. United States*, 444 U.S. 507 (1980). Political candidates can surrender some of their speech rights in exchange for a federal subsidy. See *Buckley v. Valeo*, 424 U.S. 1, 57 n.65 (1976). Perhaps, then, telephone users can surrender rights to attorneys' fees in return for more immediate benefits, such as lower monthly charges. Contracts about attorneys' fees, in particular, have been challenged and sustained. *Evans v. Jeff D.*, 475 U.S. 717 (1986), a case that *McCaskill* did not mention, holds that plaintiffs may

forego attorneys' fees under 42 U.S.C. §1988. We know from *Newton v. Rumery*, 480 U.S. 386 (1987), that it is possible to waive an entire civil-rights claim; waiver of fee-shifting is a subset of that broader agreement. Cf. *Dye v. Wargo*, 253 F.3d 296 (7th Cir. 2001). Although the agreements in *Evans* and *Newton* were forged after the events that gave rise to the claims, while here the deal came earlier, this distinction is not necessarily dispositive. A pre- versus post-dispute line has been drawn by a few statutes, such as the Fair Labor Standards Act, but §206 of the Communications Act is not among them.

One aspect of personal liberty is the entitlement to exchange statutory rights for something valued more highly. Instead of offering a benefit only to a person who is required to arbitrate or litigate, a fee-shifting statute may provide a benefit more widely to the extent that it changes the terms of trade; the customer sells the entitlement back to the phone company for cash (in the form of lower rates). The more valuable the right, the more the customer can get in exchange. Thus identifying a high-value legal right does not show that the right must be off limits to economic activity between consenting adults. The Supreme Court has held that cognovit notes—that is, agreements bypassing suit and permitting the lender to register a judgment without judicial approval, in exchange for a lower rate of interest—are compatible with the Constitution, *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174 (1972), and we recently enforced a deal with a similar confession-of-judgment feature. See *Society of Lloyd's v. Ashenden*, 233 F.3d 473 (7th Cir. 2000). A contract specifying use of the American Rule in arbitration is well short of a cognovit clause; and if the latter can be valid, why not the former?

Once again, however, the decision is not ours to make. If the provision in the tariff calling for use of the American Rule is unlawful under the Communications Act, then the right forum for complaint is the Federal Communications

Commission—though it is conceivable that the arbitrator may play a role too. Many decisions, of which *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), is the leading example, hold that defenses to performance— even those that logically defeat arbitration—belong to the arbitrator as long as there is no doubt that the parties agreed to arbitrate. See *Sphere Drake Insurance Ltd. v. All American Insurance Co.*, 256 F.3d 587 (7th Cir. 2001) (discussing this doctrine and its limits). Three courts of appeals have held that under *Prima Paint* the arbitrator determines whether contractual limitations on remedies are valid. See *Larry's United Super, Inc. v. Werries*, 253 F.3d 1083 (8th Cir. 2001); *MCI Telecommunications Corp. v. Matrix Communications Corp.*, 135 F.3d 27, 33 n.12 (1st Cir. 1998); *Great Western Mortgage Corp. v. Peacock*, 110 F.3d 222 (3d Cir. 1997). How this interacts with the filed-rate doctrine is an open question. An arbitrator has no more power to alter a tariff's rate than does a judge; and because *Central Office Telephone* treats conditions and other tariff terms as part of the rates, it may follow that an arbitrator must take the whole tariff as he finds it, in order to avoid any possibility of discriminatory application (that bugbear of rate-regulation systems, and the main target of the filed-rate doctrine). This suggests that *only* the FCC may consider an objection to the tariff's specification of the American Rule. All that matters today, however, is the doctrine that a court cannot annul any part of a tariff, no matter how telling the objection.

Metro East has one last argument: that the district court did not "invalidate" any part of a tariff (which the filed-tariff doctrine forbids) but instead held the arbitration clause "unenforceable". That's your classic distinction without a difference. What, exactly, is the legal line between holding part of a tariff "invalid" and holding it "unenforceable"? No case of which we are aware holds that a court may declare part of a tariff "unenforceable" and refuse to

apply it. That would invade the province of the agency just as surely as any declaration that the clause is "invalid."

Qwest is entitled to enforce its tariff unless and until the FCC intervenes. Accordingly, the district court should have granted Qwest's motion to compel arbitration. Metro East tells us that it views arbitration as pointless; that is its call, for no provision in the tariff *requires* the customer to pursue every dispute to the bitter end. A customer may decide not to throw good money after bad. Therefore the judgment of the district court is reversed, and the case is remanded for dismissal unless Metro East promptly informs the district judge that it prefers to arbitrate. In that event, the district court should enter an order staying the litigation and requiring the parties to arbitrate this $80 dispute.

A true Copy:

      Teste:

                         _____
                         *Clerk of the United States Court of*
                         *Appeals for the Seventh Circuit*