# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-3035

DREAMSCAPE DESIGN, INC.,

*Plaintiff-Appellant,*

v.

AFFINITY NETWORK, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Central District District of Illinois.
No. 02 C 2235—**Michael P. McCuskey**, *Chief Judge.*

_____

ARGUED JANUARY 5, 2005—DECIDED JULY 5, 2005

_____

Before KANNE, ROVNER, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Dreamscape Design, Inc., sued Affinity Network, Inc., alleging state law claims of fraud and breach of contract relating to the cost of long-distance telephone services provided by Affinity. The district court concluded that federal law preempted Dreamscape's claims and dismissed the complaint. We affirm.

## I. Background

In September 2002, Dreamscape filed a class action complaint in Illinois state court, alleging that Affinity violated the Illinois Consumer Fraud Act ("ICFA") by making misrepresentations about its rates for long-distance telephone service. Dreamscape claimed that Affinity fraudulently advertised certain per-minute rates when, in fact, the rates charged were based upon a wholly different method of calculation. Specifically, Dreamscape alleges that Affinity advertised long-distance rates of 5 cents per minute for in-state service and 8.9 cents per minute for calls from Illinois to elsewhere in the continental United States. Yet when Affinity invoiced Dreamscape for services, it billed by "TCU"[1] instead of by the minute. According to Dreamscape, Affinity's use of TCU-based charges resulted in substantially higher long-distance telephone rates than suggested by the advertisements. Dreamscape attached to its complaint invoice examples of TCU-based billing that resulted in charges equal to more than twice what the per-minute charges would have been. Dreamscape's complaint sought award of monetary damages in the amount suffered by the class, punitive damages, and injunctive relief.

In November 2002, Affinity removed the case to federal court. Affinity argued that, as an interexchange telephone communications carrier, it was subject to regulation by the Federal Communications Commission ("FCC")—specifically the so-called "filed tariff[2] (or filed rate) doctrine—pursuant

---

[1] A TCU, or "total call unit," apparently is an abstract measure, calculated in whole numbers and fractionally in tenths, that Affinity uses to determine what to charge for its long-distance services.

[2] As discussed in far greater detail *infra*, a "tariff" sets forth a long-distance carrier's rates and other terms of service. Prior to August 1, 2001, under the terms of the Federal Communications
(continued...)

to the Federal Communications Act of 1934 (the "FCA"), as amended, 47 U.S.C. § 203. Thus, Affinity contended, Dreamscape's claims challenged Affinity's rates, the terms of which were set forth in its federally mandated tariff filed with the FCC, so Dreamscape's claims were necessarily preempted by federal law.

On March 17, 2003, the district court agreed with Affinity and denied Dreamscape's motion to remand, concluding that the bulk of the claims advanced in Dreamscape's class action complaint were indeed related to Affinity's rates for long-distance service, thus calling for federal preemption under the filed rate doctrine. The court also granted Affinity's motion to compel arbitration in accordance with a clause in Affinity's tariff mandating arbitration of disputes.

The arbitrator rendered a decision on April 12, 2004, concluding that Affinity's federally filed tariff overrode state law resolution of Dreamscape's claims. The arbitrator found that there was therefore "no remedy for the Plaintiff for any fraudulent misrepresentations made by the Defendant as alleged" and dismissed Dreamscape's claims. But, because of a recent series of FCC orders calling for "detariffing" (cancellation of the requirement to file such tariffs with the FCC) by July 31, 2001, and because it was unclear whether Dreamscape's complaint alleged acts taking place after detariffing, Dreamscape was granted leave to amend its complaint to clarify the issue.[3]

---

[2] (...continued)
Act of 1934, carriers were required to file their tariffs with the FCC, which had the power to modify or even disapprove the tariffs. *See Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487 (7th Cir. 1998). Once the tariffs were filed, the carriers could not deviate from their terms unless the tariffs were amended, modified, superseded, or disapproved in accordance with FCC rules. *See id.*

[3] It is undisputed that prior to August 1, 2001, Affinity charged Dreamscape in accordance with the terms provided for in its filed
(continued...)

On April 23, 2004, Dreamscape filed an amended class action complaint, in which it renewed its earlier ICFA claim regarding rates charged prior to the detariffing deadline of August 1, 2001. Significantly, Dreamscape also added a claim alleging that it and other putative class members used and were invoiced for Affinity's services after detariffing. Dreamscape purported to be advancing "only state law claims, which claims are based on conduct of the defendant occurring after . . . July 31, 2001, and accordingly there is no applicable tariff that . . . could possibly preempt the claims under federal law[,] and no other federal law question is raised . . . ." Dreamscape also added a claim for breach of contract, alleging that a contract was formed between Affinity and Dreamscape (and other putative class members) upon acceptance of Affinity's services, and Affinity breached the contract by charging rates in excess of the agreed rates "subsequent to July 31, 2001." Dreamscape in its amended complaint again sought monetary damages, punitive damages, and injunctive relief.

Affinity filed a motion to dismiss the amended complaint, arguing that Dreamscape's claims remained preempted by federal law. For its part, Dreamscape again filed a motion to remand the case to state court. On July 12, 2004, the district court entered an order granting Affinity's motion to dismiss and denying Dreamscape's motion to remand as moot. The court concluded that, pursuant to this court's opinion in *Boomer v. AT&T Corp.*, 309 F.3d 404 (7th Cir. 2002), federal law governs the rates, terms, and conditions of long-distance service contracts, and state law cannot operate to invalidate these contracts, even after detariffing.

---

[3] (...continued)
tariff. Affinity gave Dreamscape notice that effective August 1, 2001, its services would be provided in accordance with rates, terms, and conditions contained in a customer service agreement ("CSA") that Affinity posted on its website.

The court found that Dreamscape's amended complaint challenged Affinity's rates for its long-distance service, and therefore, consistent with *Boomer*, the court concluded that the new claims were likewise preempted by federal law. Accordingly, the court dismissed with prejudice Dreamscape's amended complaint.

On appeal, Dreamscape challenges the district court's dismissal of its amended complaint based on its interpretation of *Boomer*. In the alternative, Dreamscape urges that we reconsider our preemption holding in *Boomer* in light of conflicting Ninth Circuit precedent.

## II.  Discussion

We review *de novo* the district court's order dismissing Dreamscape's claims. *See Veazey v. Communications & Cable of Chi., Inc.*, 194 F.3d 850, 853 (7th Cir. 1999). Before proceeding to the merits, however, we will briefly recap the aforementioned filed tariff doctrine and related caselaw.

As we indicated earlier, prior to August 1, 2001, the FCA required long-distance telecommunications carriers to set forth the rates and other terms and conditions of their service in tariffs to be filed with the FCC. 47 U.S.C. § 203(a); 47 C.F.R. § 61.1. This regulatory scheme begat the filed tariff doctrine,[4] under which carriers are required to charge rates and otherwise abide by the terms set forth in the filed tariffs. *AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 221-23 (1998); *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487 (7th Cir. 1998). Carriers are specifically prohibited from deviating from the tariffed rates and are not free to negotiate different rates with customers. *See* 47 U.S.C.

---

[4] The FCA's filed tariff doctrine is derived from, and a close cousin to, the tariff provisions of the Interstate Commerce Act. *See AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998).

§ 203(c); *see also Metro E. Ctr. for Conditioning & Health v. Qwest Communications Int'l, Inc.*, 294 F.3d 924, 925 (7th Cir. 2002) ("No private agreement can displace a tariff's terms."); *Cahnmann*, 133 F.3d at 487. The doctrine also applies to non-rate provisions of a tariff, such as "provisioning of services and billing," so carriers may not depart from non-price terms, either. *See* 47 U.S.C. § 203(c); *Cent. Office Tel.*, 524 U.S. at 224-25.

Although it may be tempting to view a filed tariff as simply another contract enforceable under state law, this court and others have recognized that tariffs are something more—at least the equivalent of federal regulations or law—so suits to challenge or invalidate tariffs arise under federal law. *Cahnmann*, 133 F.3d at 488-89; *see also Qwest*, 294 F.3d at 925; *accord Hill v. Bellsouth Telecomms., Inc.*, 364 F.3d 1308, 1315 (11th Cir. 2004); *Bryan v. Bellsouth Communications, Inc.*, 377 F.3d 424, 429 (4th Cir. 2004); *ICOM Holding, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 221 (2d Cir. 2001); *MCI Telecomms. Corp. v. Garden State Inv. Corp.*, 981 F.2d 385, 387 (8th Cir. 1992). Under the filed tariff doctrine, courts may not award relief (whether in the form of damages or restitution) that would have the effect of imposing any rate other than that reflected in the filed tariff. *See Cahnmann*, 133 F.3d at 489. This is so even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation. *See Cent. Office Tel.*, 524 U.S. at 222 (holding that the carrier cannot be held to the promised rate even if it conflicts with the published tariff).

The courts have enforced the apparent harshness of the doctrine because rigorous enforcement of filed tariffs serves Congress's goals of ensuring uniformity and preventing unreasonable prices or service discrimination among long-distance customers. *See* 47 U.S.C. §§ 201(b), 202(a); *see also Cent. Office Tel.*, 524 U.S. at 223; *Cahnmann*, 133 F.3d at 487, 490. Accordingly, pursuant to the filed-tariff doctrine,

courts have unhesitatingly found that claims purportedly challenging rates or terms of filed tariffs under state law were preempted. *See, e.g., Cahnmann*, 133 F.3d at 489-90; *Bryan*, 377 F.3d at 431-32.

The mandatory aspect of the regulatory scheme came to an end following passage of the Telecommunications Act of 1996. 47 U.S.C. § 160(a). Under the new legislative scheme, the FCC was empowered to exempt carriers from filing tariffs—rates, terms, and conditions of long-distance service would now be governed by individual contracts between each carrier and its customers. Pursuant to the act, the FCC issued a series of orders mandating detariffing, and as of July 31, 2001, the tariff requirement was canceled altogether. *See Boomer*, 309 F.3d at 408-09 (describing history of detariffing and citing FCC orders).

Our opinion in *Boomer* addressed the preemption question in the wake of detariffing, when the terms of individual contracts or customer service agreements governed long-distance service. In *Boomer*, the plaintiff, an AT&T customer, brought a putative class-action suit alleging that AT&T overcharged customers in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. *See Boomer*, 309 F.3d at 408. Like Affinity, AT&T notified its customers that, after detariffing, all of its rates and conditions would be set forth in a customer service agreement. *Id.* at 409. AT&T's CSA included an arbitration clause, which the plaintiff challenged as unenforceable under Illinois law. The district court agreed with the plaintiff and denied AT&T's motion to compel arbitration.

We reversed the district court's order, holding that the plaintiff's state law challenges to the arbitration clause were preempted by federal law. *Id.* at 418. In so doing, we reaffirmed our *Cahnmann* holding that, prior to detariffing, "the [FCA] completely preempted state law challenges to the terms and conditions contained in a filed tariff." *Id.* at 424 (citing *Cahnmann*, 133 F.3d at 489-90). We also

concluded, however, that Sections 201 and 202 of the FCA,[5] read together, express Congress's intent that long-distance customers receive uniform and reasonable rates, terms, and conditions of service. *See Boomer*, 309 F.3d at 421-22. Section 203, which required the filing of tariffs, was simply the express means of effectuating Congress's intent, which remained unchanged despite the passage of the Telecommunications Act of 1996 and the onset of detariffing. *See id.* ("[D]etariffing does not alter the fundamental design of the [FCA], nor modify Congress's objective of uniformity in terms and conditions for all localities."). We also noted that although the FCC was authorized to dispense with the tariff-filing requirement, it must first ensure that, consistent with Congress's intent, a tariff would "not [be] necessary to ensure that the charges, practices, classifications, or regulations . . . are just and reasonable and are not unjustly or unreasonably discriminatory." *Id.* at 421 (quoting 47 U.S.C. § 160(a)(1)). Moreover, we recognized

---

[5] Section 201(b) states:

> All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful[.]

47 U.S.C. § 201(b). Section 202(a) states:

> It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a).

that even the FCC understood that detariffing "did not affect [FCC] enforcement of carriers' obligations under [S]ections 201 and 202[,]" which expressed Congress's intent. *Id.* at 422 (citation omitted). Thus, the FCA continues to provide federal remedies for customers seeking to challenge the justness and reasonableness of long-distance charges and practices. 47 U.S.C. §§ 207, 208; *see also Boomer*, 309 F.3d at 422.

We therefore opined in *Boomer* that allowing a state law challenge to AT&T's CSA "would result in customers receiving different terms based on their locality[,]" and could thwart Congress's intent by "creat[ing] a labyrinth of rates, terms and conditions." 309 F.3d at 418, 420. We concluded that state law "cannot operate to invalidate the rates, terms or conditions of a long-distance service contract[,]" even after detariffing. *Id.* at 424. The *Boomer* plaintiff's challenge to the validity of AT&T's arbitration clause amounted to a challenge of AT&T's contract and, necessarily, the contract's rates, terms and conditions. In sum, we determined that "[a]llowing [such a] state law challenge[ ] to the validity of the terms and conditions contained in [AT&T's] long-distance contract[ ] . . . [would] result[ ] in the very discrimination Congress sought to prevent." *Id.* at 423.

Turning to the merits in the present case, it is undisputed that Affinity provided its services in accordance with its filed tariff, and then, after detariffing, in accordance with the terms of its CSA. The critical question in this case is whether Dreamscape's claims are federally preempted as a matter of law even after detariffing—a result seemingly required by our holding in *Boomer*. Dreamscape nevertheless does its level best to avoid application of *Boomer* by steadfastly insisting that its amended complaint in no way challenges Affinity's rates or filed tariff and therefore does not invoke the filed tariff doctrine. According to Dreamscape, Affinity engaged in pre-tariff (or pre-contract) fraud by inducing Dreamscape to purchase long-distance

services that were not billed in accordance with the rates advertised in 1999, and Affinity is therefore liable under Illinois law. Dreamscape claims to have sustained damages for the alleged fraud after July 31, 2000, when the tariff was no longer in effect and Affinity's rates were thereafter delineated in its CSA.

Perhaps recognizing the uphill battle it faces with respect to *Boomer* and other preemption caselaw, Dreamscape styles this appeal as a simple dispute over the proper interpretation of its amended complaint—under the well-pleaded complaint doctrine, Dreamscape advanced only state law claims that did not challenge Affinity's rates, and thus federal law is not implicated at all. Dreamscape therefore argues that *Boomer* is not relevant to the present case. But even if *Boomer* applies, Dreamscape asks that we reconsider *Boomer*'s preemption holding in light of contrary reasoning in *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003).

As for its breach of contract claim, Dreamscape candidly conceded at argument that the claim necessarily challenged the rates contained in Affinity's filed tariff, but nevertheless suggests that the claim is not necessarily preempted if we favor *Ting* over *Boomer* or otherwise resolve the apparent conflict between the two cases.

### A. Fraud

We first consider Dreamscape's assertion that the well-pleaded complaint doctrine saves its fraud claims from preemption. Under this doctrine, "whether a case is one arising under the Constitution or a law or treaty of the United States . . . must be determined from what necessarily appears in the plaintiff's [complaint] . . ., unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose." *City of Chicago v. Comcast Cable Holdings*, 384 F.3d 901, 904 (7th Cir. 2004) (quoting *Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914)).

Dreamscape argues that the doctrine, as employed in our recent *Comcast* opinion, applies here, and we should reach the same result. We disagree. *Comcast* had nothing to do with long-distance services or filed tariffs or rates regarding such service. Instead, at issue in that case was 47 U.S.C. § 542, which governs franchise fees relating to cable operators. We concluded that the plaintiff's claims did not present a federal question because Congress did not intend § 542 "to override state law, let alone to deny states all power in the field." *Id.* at 905. Indeed, it was clear that Congress left to the states "most questions about the regulation and taxation of cable TV franchises." *Id.* Therefore, because Congress had not indicated its intent that federal law preempt state regulation of such franchises, the *Comcast* defendants' efforts to raise a § 542(b) federal defense to the plaintiff's action could not invoke federal jurisdiction over the city's state law claims. *See id.* We concluded that, pursuant to the well-pleaded complaint doctrine, the city pleaded only state-law claims that did not implicate federal law, so it was necessary to remand the action to state court. *See id.*

*Comcast* is readily distinguishable from the present case, however. In contrast to § 542, there is no question that Congress intended the FCA to displace state law with respect to long-distance telephone service terms and conditions. *See Boomer*, 309 F.3d at 423. The only question here is whether such preemption survived detariffing, which we answered in the affirmative in *Boomer*. *Comcast* says nothing about that issue, so Dreamscape cannot simply invoke the well-pleaded complaint doctrine, as applied in *Comcast*, to save its claims from preemption here.[6]

---

[6] For similar reasons, our opinion in *Fedor v. Cingular Wireless Corp.*, 355 F.3d 1069 (7th Cir. 2004), does not help Dreamscape. That case dealt with a completely different provision of the FCA,
(continued...)

A better case for Dreamcast is *In re Long Distance Telecommunications Litigation*, 831 F.2d 627 (6th Cir. 1987) ("*Long Distance Litigation*"), which was decided prior to detariffing. In *Long Distance Litigation*, AT&T was alleged to have fraudulently advertised that its rates were lower than competitors' rates but hid the fact that it actually charged for uncompleted phone calls. 831 F.2d at 628. Among other claims, the plaintiffs filed various state law claims for fraud and deceit, and the Sixth Circuit held that the district court erroneously found these claims preempted by the FCA. *Id.* at 633-34. The court determined that the plaintiffs' claims did not relate to long-distance rates or service, but simply sought damages for AT&T's failure to disclose its practice of billing for uncompleted calls. *See id.* at 634. The court concluded, however, that if the case had related to such rates or service, preemption would be likely. *See id.*

In the present case, Affinity is alleged to have fraudulently advertised that it billed at per-minute rates, when in fact it billed by TCU. In certain respects, as Dreamscape alleges, Affinity's alleged fraud is facially difficult to distinguish from AT&T's. So it is helpful to look not only to the nature of the claims advanced, but also to the relief sought in order to determine whether the claims intrude upon the areas of communications law expressly reserved to the FCC's purview. *See Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 989 (7th Cir. 2000). If, for example, the

---

[6]  (...continued)
47 U.S.C. § 332(c)(3)(A), which governs mobile communications and specifically reserves to the states the right to regulate non-rate "terms and conditions of commercial mobile services." *Id.* at 1071. The plaintiff's claim did not challenge Cingular's rates or their reasonableness, nor did it challenge market entry as defined in § 332. *See Fedor*, 355 F.3d at 1074. Preemption was therefore not appropriate under § 332. *See id.* at 1074-75.

*Long Distance Litigation* plaintiffs sought rescission of the contract because of AT&T's failure to disclose its billing practices, we agree that preemption would be improper in that case. After all, such a claim arguably would not seek relief that would alter or affect AT&T's rates, terms, or conditions of service—the sort of requested relief that even the *Long Distance Litigation* court recognized as likely to bring a claim within the bounds of federal jurisdiction. 831 F.2d at 634 (citation omitted).

The precise relief sought by the *Long Distance Litigation* plaintiffs is not readily discernible, but it is clear, as we determined in *Cahnmann*, that the adjudication of those plaintiffs' claims would not have required determining the validity of AT&T's tariff. *See Cahnmann*, 133 F.3d at 488. This stands in stark contrast to Dreamscape's claims in the present case—no matter how Dreamscape attempts to characterize them—so even *Long Distance Litigation* cannot save Dreamscape. Dreamscape does not seek rescission of the contract, but instead seeks monetary damages for what it claims to have overspent for long-distance service as a result of Affinity's alleged fraud—in other words, payment of the difference between what Affinity advertised and what Affinity's tariff or CSA provided for. We do not see how a court could possibly grant that form of relief without invalidating the contracted rates at issue, as delineated first in the filed tariff and then under the CSA. Payment of such damages would effectively grant a lower rate to Dreamscape than to other customers not included in the putative class and would require the court to determine a "reasonable" rate. *Cf. Bryan*, 377 F.3d at 431. Likewise, the special or punitive damages Dreamscape seeks would amount to a retroactive rate change as well. To grant any of this requested relief would be squarely at odds with both the filed tariff doctrine and our holding in *Boomer.*

As we noted in *Boomer*, with the passage of the Telecommunications Act of 1996, it is clear that Congress

envisioned *some* role for state law after detariffing, so federal law no longer completely preempts the entire field. *Boomer*, 309 F.3d at 424. With respect to long-distance service contracts, however, we expressly held (and reaffirm now) that state law cannot operate to invalidate the terms and conditions of such contracts. Because Dreamscape's claim seeks relief that would in effect do just that, we fail to see how Dreamscape's claims are not preempted in the same way the *Boomer* plaintiff's claims were. In short, we agree with the district court's conclusion that even after amending its complaint, Dreamscape's claims and the relief it sought primarily concern the rates Affinity has charged for its long-distance service and should be preempted.

Nevertheless, Dreamscape argues that it only challenges Affinity's pre-contract promises, not the rates or other terms of Affinity's tariff or CSA. According to Dreamscape, "[i]t matters not whether [Affinity] was selling cars or fruit or refrigerators or long-distance service. The ICFA requires that [Affinity's] advertising and solicitations be truthful." Dreamscape's blithe assertion notwithstanding, it *does* matter in this case what sort of goods or services Affinity sells, because that is precisely the point of *Boomer* and other cases exploring the bounds of preemption. In this instance, Congress has clearly indicated its goal of ensuring uniform and reasonable rates for long-distance service—thus calling for preemption in this area, if not the unrelated types of commerce Dreamscape lists.

Although Dreamscape argues that Affinity's actions amounted to simple fraud, we find that its fraud claims are really no different than a breach of contract claim (notwithstanding that it advances such a claim under a separate count, as discussed below), in terms of the relief it seeks. *See Cahnmann*, 133 F.3d at 490. As we indicated above, the relief Dreamscape seeks is impossible to grant without effectively invalidating Affinity's contractual rates, terms, or conditions. *See Boomer*, 309 F.3d at 423; *cf. ICOM*, 238

F.3d at 222-23. The substance of Affinity's contractual provisions cannot be severed from the alleged fraud that induced Dreamscape into purchasing Affinity's long-distance services to begin with. *Cf. Cahnmann*, 133 F.3d at 489 (noting that if the parties' contract had included a provision entirely unrelated to the tariff in which the defendant promised "to sell the plaintiff a bushel of Ugli fruit at market price," such a promise might be severable from the defendant's filed tariff and thus actionable under state law). Affinity's alleged fraud pertained to *something*, after all, and that "something" is set forth within Affinity's filed tariff and CSA, which detail the rates, terms, and conditions of which Dreamscape ultimately complains.

Therefore, it is the artful pleading doctrine, not the well-pleaded complaint doctrine, that properly guides interpretation of Dreamscape's amended complaint. *See Bastien*, 205 F.3d at 986 ("It is true that a plaintiff is . . . master of his own complaint and may seek to avoid federal jurisdiction by pleading only state law claims, . . . but when that complaint, fairly read, states a federal question, the defendant may remove the case to federal court.") (internal citations omitted). Dreamscape seeks to convince us that its fraud claims do not touch upon Affinity's rates and, as the *Cahnmann* plaintiff did, "emphatically disclaims any intention of prosecuting a federal claim." *Cahnmann*, 133 F.3d at 489.

We are just as unpersuaded here as we were in *Cahnmann*, however. Our interpretation of Dreamscape's complaint and conclusion arise from an "uncontroversial application of the artful pleading doctrine." *Id.* at 490 (quotation marks omitted). Pursuant to *Boomer* and related caselaw, we conclude that Dreamscape's fraud claims are federally preempted and were properly removed to federal court. *See Boomer*, 309 F.3d at 423; *see also Cahnmann*, 133 F.3d at 490 ("If a claim can arise only under federal law,

because federal law has extinguished the state law basis under which it might otherwise arise, the case is removable to federal court even if the plaintiff sedulously avoids mention of federal law in his complaint."); *see also Bastien*, 205 F.3d at 986 ("[I]n some instances, Congress has so completely preempted a particular area that . . . removal is proper despite the well-pleaded complaint rule.") (citations omitted).

### B. Breach of Contract

Dreamscape's remaining claim alleges that Affinity breached its contract. But Dreamscape candidly concedes (as it must) that this claim necessarily challenges Affinity's rates and terms as set forth in its tariff and CSA and thus cannot survive unless we "revisit" *Boomer*—by "revisit," we assume that Dreamscape is asking that we either distinguish *Boomer* or set it aside in favor of the Ninth Circuit's *Ting* decision. We see no way, however, to distinguish *Boomer* and, further, reaffirm it because our analysis in *Boomer* remains sound.

We are unpersuaded by *Ting*. Contrary to *Boomer*, the Ninth Circuit held that federal preemption under the filed tariff doctrine did not survive detariffing. *Ting*, 319 F.3d at 1135. In fact, the court expressly rejected *Boomer*'s preemption analysis, concluding that, in the detariffed environment, state laws did not obstruct Congress's intent with respect to the FCA. *See id.* The Ninth Circuit concluded that, with the passage of the Telecommunications Act of 1996, Congress intended state contract and consumer protection laws to play a role in governing the carrier-consumer relationship after detariffing, and preemption did not survive the passage of the act. *See id.* at 1144. The court believed that Congress intended the goals expressed in Sections 201 and 202 to be enforced by application of state

law. *See id.* at 1144-45. Therefore, the Ninth Circuit held, the plaintiffs could challenge the carrier's CSA under California state law.

We disagree with this interpretation. For the reasons we discussed at length in *Boomer*, we do not see how Congress's clearly expressed intent regarding uniformity and reasonableness of rates, as demonstrated in Sections 201 and 202 of the FCA, can be squared with *Ting*'s apparent conclusion that state contract law can invalidate the terms or conditions of long-distance contracts after detariffing. *See Boomer*, 309 F.3d at 417-23. Indeed, in *Boomer* we rejected the very district court opinion that *Ting* affirmed. *See id.* at 422. As indicated in *Boomer* and in this opinion, we conclude that even after detariffing, state law cannot operate to invalidate the rates, terms, or conditions of a long-distance service contract (which is precisely what Dreamscape's amended complaint seeks, whether it admits it or not) because such a result would be contrary to Congress's intent as expressed in Sections 201 and 202.

Dreamscape's claims are preempted by federal law, and removal of Dreamscape's action and dismissal of its amended complaint were appropriate.

### III. Conclusion

For the reasons given, we AFFIRM the order of the district court dismissing Dreamscape's amended complaint.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—7-5-05