[No. 81006-1.   En Banc.]
Argued March 13, 2008.    Decided August 28, 2008.

MICHAEL MCKEE, *Individually and on Behalf of All Other Persons Similarly Situated, Respondent,* v. AT&T CORPORATION, *Appellant.*

374

376

*Daniel M. Waggoner* and *Cassandra L. Kinkead* (of *Davis Wright Tremaine, LLP*), for appellant.

*Scott M. Kane* (of *Lacy & Kane*); and *F. Paul Bland, Jr.*, and *Leslie A. Bailey* (of *Public Justice, PC*, of counsel), for respondent.

*Robert M. McKenna, Attorney General*, and *Katherine M. Tassi, Assistant*, on behalf of the Attorney General's Office, amicus curiae.

*Kelby D. Fletcher, Sarah C. Schreck*, and *Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

¶1 CHAMBERS, J. — Michael McKee filed this class action suit, alleging AT&T wrongly charged him (and others) city utility surcharges and usurious late fees. When the Chelan County Superior Court found the dispute resolution provision of AT&T's "Consumer Services Agreement" unconscionable and denied its motion to compel arbitration, AT&T appealed. The Court of Appeals, Division Three, certified the case to this court. We affirm the trial court and remand for further proceedings.

FACTS

¶2 McKee lives near Wenatchee, Washington, and signed up for AT&T long distance phone service in November 2002. His monthly bills included a Wenatchee city utility tax surcharge, even though he lives outside the Wenatchee city limits. When he called AT&T to resolve this issue, at first, the various operators merely tried to sell him a new long distance package. Finally, he was told that taxes were assessed by zip code. Unfortunately, McKee's zip code includes people who live both inside and outside the Wenatchee city limits. McKee contends that AT&T collects the tax from all of its customers who live within the zip code, whether the customers owe the tax or not. A late fee of 1.5 percent applies if the customer does not pay all charges on time. The charges McKee challenges amount to no more than $2 in any given month, less than $20 total in a year. But McKee notes that after many years and many customers, small amounts add up to very large sums.

¶3 After his individual attempts to resolve his billing issues with AT&T failed, McKee filed this class action lawsuit, alleging violations of Washington's Consumer Pro-

tection Act, chapter 19.86 RCW, and Washington's usury statute, chapter 19.52 RCW, as well as negligence and breach of contract. AT&T removed the action to federal district court, claiming McKee had raised federal law in his complaint. After the complaint was amended to omit any reference to federal law, the federal court remanded the case back to Chelan County Superior Court.

¶4 AT&T then moved to compel arbitration under its Consumer Services Agreement. At the time McKee agreed to use AT&T as his long distance provider, he did not sign any agreement with AT&T and was not informed of any terms and conditions associated with AT&T service. After he began using AT&T, it sent him mail, which may have included a contract. He had not retained any of the mail and did not know the terms of his agreement with AT&T. In support of the motion to compel arbitration, AT&T employees Howard Spierer and April Morlock filed declarations averring that a specific agreement was sent to McKee in November as part of his "fulfillment package" and attached a copy of that agreement to their declarations. We detail the specifics of the declarations because AT&T later repudiated the declarations it filed and the agreement it sought to enforce.

¶5 Spierer, a senior attorney with AT&T, signed a declaration on January 8, 2004, declaring that since August 1, 2001, AT&T's relationship with its customers has been governed by the terms of a Consumer Services Agreement. The Consumer Services Agreement has been revised several times. "Indeed, the version sent to Mr. McKee was an amended [Consumer Services Agreement], effective March 1, 2002." Clerk's Papers (CP) at 691. Morlock filed a similar declaration dated October 23, 2003, in support of AT&T's motion to compel arbitration. She declared,

1. I am a Fulfillment/Response Operations Manager for AT&T Corp.

2. It is my responsibility as a Fulfillment/Response Manager to ensure that all customers receive a "fulfillment package" from AT&T as a result of an order he/she may have placed. It is

a business practice of AT&T to mail this fulfillment package within 8-10 business days from the date the customer places his/her order . . . .

   3. Mr. McKee became an AT&T customer in November 2002. Attached as Exhibit A to this declaration is a true and correct copy of the fulfillment package.

CP at 1114. Both Spierer and Morlock attached the same version of the Consumer Services Agreement, which became the subject of several hearings in Chelan County.

¶6 For clarity, an entire copy of the Consumer Services Agreement is included as an addendum to this opinion.[1] We focus primarily on the dispute resolution provisions. Section 7 of the agreement, entitled "Dispute Resolution," requires binding arbitration of all disputes related to the agreement. It forbids class actions and requires that all arbitrations be kept confidential. The agreement also states in relevant part that "[n]o dispute may be joined with another lawsuit, or in an arbitration with a dispute of any other person, or resolved on a class-wide basis," and "[a]ny arbitration shall remain confidential. Neither you nor AT&T may disclose the existence, content, or results of any arbitration or award, except as may be required by law or to confirm and enforce an award." CP at 718-19. The dispute resolution section also provides that any claim must be brought within two years and limits a consumer's right to collect punitive damages and attorney fees.

¶7 McKee opposed the motion to compel arbitration and moved to stay arbitration, claiming the agreement was substantively and procedurally unconscionable. He claimed he had no meaningful choice and the agreement was overly one-sided and harsh because it prohibited class actions, shortened the statute of limitations, prohibited punitive damages and attorney fees, required arbitration be kept secret, and required application of New York law. AT&T is

---

[1] The appended copy of the agreement was obtained from web archives and is available at http://web.archive.org/web/20011208114437/serviceguide.att.com/ACS/ext/agreement.cfm (last visited Aug. 22, 2008). The text is identical to the record with the exception of the hyperlinks.

incorporated in New York. McKee filed declarations from a former Washington assistant attorney general and several other experienced Washington attorneys. Owen Clarke, former Washington State assistant attorney general for 25 years, and the head of the Spokane County Consumer Protection Division for 17 years, declared that McKee's class action suit would require a skilled attorney and that without class certification the class members would be unable to retain qualified counsel. Two other experienced attorneys, Garfield Jeffers and David Thorner, declared that moderate income consumers cannot afford the hourly rates of trial lawyers and that no attorney would take a case on a contingent basis where the amount in controversy is so small and the risk so great.

¶8 On June 18, 2004, Judge Bridges heard oral argument on the motions to compel and stay arbitration. He denied the motion to compel arbitration, finding the entire dispute resolution section of the agreement substantively unconscionable because of the provisions prohibiting class actions, shortening the statute of limitations, limiting damages, requiring confidentiality, and requiring the application of New York law. Judge Bridges found the unconscionable provisions were not severable from other provisions and declared the entire dispute resolution clause unenforceable.

¶9 After Judge Bridges's oral ruling, more than a year passed before the parties presented findings of fact. It appears counsel was awaiting this court's decisions in *Zuver v. Airtouch Communications, Inc.*, 153 Wn.2d 293, 103 P.3d 753 (2004) and *Adler v. Fred Lind Manor*, 153 Wn.2d 331, 103 P.3d 773 (2004).

¶10 During that year, in March 2005, approximately nine months after the learned trial judge issued his oral opinion on June 18, 2004, Spierer filed a new declaration, declaring that AT&T had revised its Consumer Services Agreement for "its millions of residential customers." CP at 126-31. He declared that he was mistaken in his 2001 declaration. He contended that AT&T had amended its

agreement "in significant ways, including, for example, the removal of the two-year statute of limitations, the ability of the customer to determine whether the proceedings should be confidential, and specifically allowing consumers to obtain statutory relief—including damages and attorney's fees—through the arbitration process."[2] CP at 127. Spierer attached a revised draft of the AT&T Consumer Services Agreement that AT&T now contended was applicable to McKee.[3] AT&T moved for reconsideration and asked the court to consider this new version of the Consumer Services Agreement. When findings of fact and conclusions of law were finally presented to him, Judge Bridges expressed some frustration in the long delay, declined to sign either party's proposals, and instead adopted his oral ruling rendered more than one year earlier as his findings and conclusions. The judge also denied the motion for reconsideration and declined to consider a new version of the agreement.

¶11 AT&T appealed, and the Court of Appeals certified the case to this court.[4] The only Consumer Services Agree-

---

[2] The record is somewhat confusing, but it appears that there are at least five versions of the AT&T Consumer Services Agreement in the record below. It appears that AT&T revised the agreement at least three times in 2002, twice in November, the month that McKee became a customer.

[3] The agreement provides that "**IF YOU CONTINUE TO BE ENROLLED IN, USE, OR PAY FOR THE SERVICES AFTER ANY CHANGES IN THE PRICES, CHARGES, TERMS OR CONDITIONS, YOU AGREE TO THE CHANGES.**" CP at 719. Notice to the customer is described in section 1(b), "Increases to the prices or charges for the Services are effective no sooner than fifteen days after we post them on our Web site," and section 9, "With respect to all other changes to this Agreement, we will notify you of the changes, and they will be effective no sooner than fifteen days after we post them at www.att.com/serviceguide/home. You may also request a copy of the revised Agreement . . . by calling AT&T toll free at 1-888-288-4099." *Id.*

[4] In the weeks preceding oral argument before this court, AT&T filed a motion, first asking to either withdraw its appeal, while preserving the right to appeal the same issues again later, or stay the appeal pending action by the United States Supreme Court, and later withdrawing its motion to withdraw and merely asking to stay pending a petition for certiorari in *Laster v. T-Mobile USA, Inc.*, 252 F. App'x 777, 2007 U.S. App. LEXIS 25265 (9th Cir.) (unpublished), *cert. denied*, 128 S. Ct. 2500 (2008). We declined to stay this appeal merely on the chance that the United States Supreme Court would agree to hear *Laster*, which ultimately it did not.

ment considered by Judge Bridges was the March 1, 2002 agreement proffered by Spierer and Morlock on January 8, 2004 and October 23, 2003 respectively, and it is the only agreement before us for review.[5]

STANDARD OF REVIEW

¶12 Arbitrability is a question of law we review de novo. *Zuver*, 153 Wn.2d at 302. The burden of proof is on the party seeking to avoid arbitration. *Id.* (citing *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 92, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000)). When the validity of an agreement to arbitrate is challenged, courts apply ordinary state contract law. *Luna v. Household Fin. Corp. III*, 236 F. Supp. 2d 1166, 1173 (W.D. Wash. 2002) (quoting *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2001)); *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995). General contract defenses such as unconscionability may invalidate arbitration agreements. *Luna*, 236 F. Supp. 2d at 1173 (quoting *Circuit City*, 279 F.3d at 892); *see also Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996)). Unconscionability is also a question of law we review de novo. *Nelson v. McGoldrick*, 127 Wn.2d 124, 131, 896 P.2d 1258 (1995).

CHOICE OF LAW

¶13 We turn first to the question of which state's law should apply to determine the validity of the agreement. Section 8(f) of AT&T's Consumer Services Agreement provides that New York law governs the agreement. Both the

---

[5] AT&T argues the trial court should have determined which version of the agreement was in effect before ruling on unconscionability and that it is now unclear which version the court's unconscionability ruling applies to. We disagree. As described above, when the court ruled on AT&T's motion to compel arbitration in June 2004, there was only one version of the agreement before the court, namely, the one submitted by both Spierer and Morlock and which we review here. We decline to review a version of the agreement that the trial court never considered.

dispute resolution section and the agreement as a whole state that if any individual part is found unenforceable, it should be severed and the rest enforced. We review choice of law questions de novo. *Erwin v. Cotter Health Ctrs.*, 161 Wn.2d 676, 690-91, 167 P.3d 1112 (2007).

¶14 The choice of law question focuses us on very similar issues to those we considered in *Dix v. ICT Group, Inc.*, 160 Wn.2d 826, 161 P.3d 1016 (2007), where we held that a forum selection clause selecting the state of Virginia was substantively unconscionable because it effectively denied relief under Washington's Consumer Protection Act, which evidences a strong public policy in favor of class actions for small consumer claims.

¶15 We generally enforce contract choice of law provisions with certain exceptions. *Erwin*, 161 Wn.2d at 695-96. We disregard the contract provision and apply Washington law if, without the provision, Washington law would apply; if the chosen state's law violates a fundamental public policy of Washington; and if Washington's interest in the determination of the issue materially outweighs the chosen state's interest. *Id.* at 694-95 (citing *O'Brien v. Shearson Hayden Stone, Inc.*, 90 Wn.2d 680, 685, 586 P.2d 830 (1978) and quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1971)). We will enforce a choice of law provision unless all three of these conditions are met.[6] *Id.* at 696.

¶16 Each of these conditions is met in this case. First, if there were no choice of law provision, Washington law would be applied to this consumer contract performed in Washington. Washington applies the "most significant relationship" test from the *Restatement, supra*, § 188. *Mulcahy v. Farmers Ins. Co. of Wash.*, 152 Wn.2d 92, 100, 95 P.3d 313 (2004). Courts weigh the relative importance to the particular issue of (a) the place of contracting, (b) the

---

[6] Additional exceptions to the general rule, not raised here, include when the issue is one that could have been provided for in an express agreement or when the state has no substantial relationship to the action and there is no other reasonable basis for the parties' choice. *Erwin*, 161 Wn.2d at 694 (citing RESTATEMENT, *supra*, § 187).

place of negotiation of the contract, (c) the place of performance of the contract, (d) the location of the subject matter of the contract, and (e) the domicile, residence, or place of incorporation of the parties. *Id.* (citing RESTATEMENT, *supra*, § 188). Here, Washington is the place of contracting, the place of negotiation (what little there was), the place of performance, the location of the subject matter, and the residence of one of the parties. New York's only tie to this litigation is that it is the state of incorporation of AT&T. We therefore conclude that, absent a choice of law clause, Washington law would apply to this dispute.

¶17 Second, New York law, which allows waiver of class-based relief, conflicts with our state's fundamental public policy to protect consumers through the availability of class action. *See Scott v. Cingular Wireless*, 160 Wn.2d 843, 854, 161 P.3d 1000 (2007);[7] *Dix*, 160 Wn.2d at 829. Protecting parties in a position of weaker bargaining power from exploitation is among the types of fundamental public policy contemplated by *Restatement*, *supra*, § 187(2)(b) cmt. g.

¶18 The proper focus here, under section 187(2)(b) of the *Restatement*, is whether New York law permitting a class action ban is contrary to a Washington fundamental policy. This question is different than determining whether a class action ban under some circumstances is substantively unconscionable. We have held that some class action prohibitions may be conscionable. But application of New York law would permit waiver of any and all class action claims, and we have declared a strong Washington State public policy in support of the use of class action claims to pursue actions for small-dollar damage claims under the Washington State Consumer Protection Act. *See Scott*, 160 Wn.2d at 854.

¶19 In *Dix*, we explained that forum selection clauses contravening the " 'strong public policy of the forum in

---

[7] This case is, in nearly all respects, a companion case to *Scott v. Cingular Wireless*, where this court struck down as substantively unconscionable a contract of adhesion requiring waiver of class actions of even very small consumer claims. *Scott*, 160 Wn.2d 843.

which suit is brought' " may be invalid and we held that a forum selection clause designating Virginia as the forum was unenforceable against Washington citizens asserting small-dollar Consumer Protection Act claims. *Dix*, 160 Wn.2d at 836 (quoting *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972)). We held that a forum selection clause was substantively unconscionable because it denied relief by selecting a forum in which consumer class actions were not available. *Id.* at 837. Specifically, we held that "a forum selection clause that seriously impairs the plaintiff's ability to go forward on a claim of small value by eliminating class suits in circumstances where there is no feasible alternative for seeking relief violates public policy and is unenforceable." *Id.*

¶20 In contrast, New York courts have held that class action waivers are enforceable under New York law. *Tsadilas v. Providian Nat'l Bank*, 13 A.D.3d 190, 191, 786 N.Y.S.2d 478 (2004); *Ranieri v. Bell Atl. Mobile*, 304 A.D.2d 353, 354, 759 N.Y.S.2d 448 (2003). Under New York law, class-based relief would not be available in cases such as *Scott* and the one before us now. Therefore, the choice of New York law in this case is unconscionable under *Dix* because it conflicts with Washington's fundamental public policy favoring the availability of class-based relief for small consumer claims. Accordingly, we hold that Washington's strong Consumer Protection Act policy favoring class adjudication of small-dollar claims is a "fundamental policy" contemplated by the *Restatement*, *supra*, § 187(2)(b).

¶21 Finally, Washington's interest in protecting large classes of its consumers materially outweighs New York's limited interest in this matter. *See Erwin*, 161 Wn.2d at 695. Thus, the New York choice of law provision in AT&T's Consumer Services Agreement is unenforceable and Washington law will be applied.

FEDERAL COMMUNICATIONS ACT OF 1934 PREEMPTION

¶22 Next, AT&T argues that Washington law is preempted by the Federal Communications Act of 1934 (FCA) (codified as amended at 47 U.S.C. §§ 151-161, 201-231, 251-261, 301-339, 351-363). AT&T distinguishes this case from *Scott* because the federal act in question there was the federal arbitration act (FAA), Title 9 U.S.C. *Scott*, 160 Wn.2d at 857-59. AT&T argues that the FCA "demonstrates a congressional intent that customers receive uniform terms and conditions of service" and that to achieve such uniformity, it is Congress's and the Federal Communications Commission's (FCC) goal to create a federal, uniform standard for determining the validity of the rates, terms, and conditions of carriers. Br. of Appellant at 19. AT&T contends that Washington's consumer protection and contract laws are impliedly preempted by the FCA because they "stand[ ] as an obstacle to the accomplishment and execution of Congress's and the FCC's purpose and objective of creating a federal, uniform standard for determining the validity of long-distance service contract rates, terms, and conditions." *Id.* at 19-20.

¶23 Under the supremacy clause of the United States Constitution article VI, clause 2, state laws are not superseded by congressional legislation unless that is the clear and manifest purpose of Congress. *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 78, 896 P.2d 682 (1995); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992). Preemption is a question of law we review de novo. *Axess Int'l Ltd. v. Intercargo Ins. Co.*, 107 Wn. App. 713, 722, 30 P.3d 1 (2001) (citing *Hoddevik v. Arctic Alaska Fisheries Corp.*, 94 Wn. App. 268, 278, 970 P.2d 828 (1999)). Conflict preemption is found where it is impossible to comply with both state and federal law or where state law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248, 104 S. Ct.

615, 78 L. Ed. 2d 443 (1984). The obstruction strand of conflict preemption focuses on both the objective of the federal law and the method chosen by Congress to effectuate that objective, taking into account the law's text, application, history, and interpretation. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494, 107 S. Ct. 805, 93 L. Ed. 2d 883 (1987) ("state law . . . is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal"); *Jones v. Rath Packing Co.*, 430 U.S. 519, 526, 97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977) (courts should consider how law is applied and interpreted in addition to plain text). Thus, the question for us is whether Congress's intent or goals would truly be frustrated if AT&T were required to comply with Washington's laws regarding the formation of consumer contracts and the strong public policy of Washington's Consumer Protection Act that consumers be able to vindicate their right to be free of unfair and deceptive practices in consumer transactions. *See Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003) and cases cited therein; *see also* RCW 19.86.020.

¶24 AT&T urges us to follow a Seventh Circuit opinion that AT&T contends is the leading case on preemption under the FCA. *Boomer v. AT&T Corp.*, 309 F.3d 404 (7th Cir. 2002). The Washington State attorney general, appearing as amicus, urges us not to follow *Boomer*. The attorney general argues the issue of whether the FCA preempts state consumer protection and contract laws was considered and correctly decided five years ago by the Ninth Circuit Court of Appeals in *Ting*, 319 F.3d 1126. The Ninth Circuit examined the FCA's text, application, history, and interpretation thoroughly before reaching its conclusion that the FCA, after detariffing, no longer preempts state laws in claims arising from the rates, terms, and conditions of a long distance carrier's customer contract. *Id.* at 1130-33, 1137-46.

¶25 Congress originally enacted the FCA in 1934, ch. 652, 48 Stat. 1064 (codified as amended at 47 U.S.C. §§ 151-161, 201-231, 251-261, 301-339, 351-363). It was passed in a

monopolistic environment. Section 203(a) was intended to provide fair contracts through a tariff system. It required telecommunications carriers to file with the FCC a list of tariffs, or "schedules," showing "all charges . . . and . . . the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a). Tariffs covered not only the rates but the terms and conditions of customer contracts. The act prohibited any "classification, regulations, or practice affecting such charges, except as specified" in a carrier's filed tariffs. *Id.* § 203(c)(3). In the filed-tariff environment, consumers were, in theory, protected from unjust, unreasonable, or discriminatory rates, terms, and conditions by the FCC's prior determination that the carrier's filed rate was "just" and "reasonable" and not unreasonably or unduly discriminatory. Once a tariff was approved by the FCC, it then carried the force of law and became binding on both the consumer and the carrier. *Brown v. MCI Worldcom Network Servs., Inc.*, 277 F.3d 1166, 1170 (9th Cir. 2002) (quoting *Lowden v. Simonds-Shields Lonsdale Grain Co.*, 306 U.S. 516, 520, 59 S. Ct. 612, 83 L. Ed. 953 (1939)). Under this regime, courts frequently held that state law contract claims were barred. *See, e.g., Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 228, 118 S. Ct. 1956, 141 L. Ed. 2d 222 (1998); *In re NOS Commc'ns*, 495 F.3d 1052 (9th Cir. 2007).

¶26 Over time, the monopolistic model fell way to deregulation and free market pressures. Under the old regime, AT&T had achieved a near monopoly in the telecommunications market, and there were many companies eager to enter the telecommunications market. Starting in the early 1980s, the FCC tried to prohibit tariff filing by nondominant carriers (i.e., those other than AT&T) on the ground that market forces would guarantee reasonable rates without collusive pricing. *In re Policy & Rules Concerning Rates for Competitive Common Carrier Servs.*, 99 F.C.C.2d 1020, 1028-29 (1985). Finally, in 1996, Congress fundamentally changed the communications act's scheme by adopting a national policy of opening all telecommuni-

cations markets to competition and providing a deregulatory, procompetition framework. H.R. CONF. REP. No. 104-458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124. As the Ninth Circuit explained:

> Finally armed with the requisite congressional authorization, the FCC promptly issued a Notice of Proposed Rulemaking on March 25, 1996, to "forbear from applying" the tariffing requirements of § 203 of the 1934 Act. Notice of Proposed Rulemaking, 11 F.C.C.R. 7,141 (1996). In the Notice, the Commission tentatively concluded that tariffs were no longer necessary because market forces were sufficient to protect consumers from unjust and unreasonable rates, terms, and conditions. *Id.* at ¶¶ 30, 31 (concluding that removing filing requirement will promote competition and prevent collusive pricing). Following a comment period, the FCC issued an order of mandatory detariffing on October 29, 1996, *see* Second Report and Order, 11 F.C.C.R. 20,730 (1996), thus confirming that "enforcement of the tariffing provision is neither necessary to ensure just and reasonable, non-discriminatory rates, nor necessary for the protection of consumers." *MCI WorldCom, Inc., v. FCC*, 209 F.3d 760, 763 (D.C. Cir. 2000) (citing Second Report and Order, 11 F.C.C.R. 20,730, at ¶ 21).

*Ting*, 319 F.3d at 1132.

¶27 When Congress authorized the FCC to eliminate the filing requirement, it permitted the tariff filing mechanism to be replaced by a market-based mechanism in the form of individual negotiated contracts between carriers and their customers. *Id.* Unlike tariff filing, however, this market-based mechanism depends in part on state law. *Id.* at 1133. The market-based method of achieving the act's goals of reasonableness, fairness, and nondiscrimination in carrier contracts does not require a single, federal standard but rather depends in part on state law for the protection of consumers in the deregulated and competitive marketplace. *Id.*

¶28 The *Boomer* court, relied upon by AT&T, failed to do a historical analysis. *Boomer*, 309 F.3d at 417-23. The

*Boomer* court based its conclusion upon a textual analysis of sections 201(b) and 202(a) of the 1996 Telecommunications Act. *Id.* Sections 201(b) and 202(a) of the act, which survived detariffing, require that charges and practices be "just and reasonable" and prohibit "unjust or unreasonable discrimination" in charges and practices. But as pointed out by the Ninth Circuit, "save for *Boomer*, no court has ever referred to § 201 or § 202 in declaring a carrier's tariff immune from state-law challenge. That role had always been reserved for § 203 and the filed rate doctrine." *Ting*, 319 F.3d at 1138 (citing *Cent. Office*, 524 U.S. at 223).[8]

¶29 The FCC no longer enforces section 203's filing requirements. We agree with the Ninth Circuit that reliance on sections 201 and 202 for federal preemption is untenable. *Ting*, 319 F.3d at 1139. Congress unquestionably intended that consumers receive fair and reasonable rates. 47 U.S.C. § 202(a) makes it unlawful for a carrier to "make any unjust or unreasonable discrimination" for "like communication service" or "to make or give any undue or unreasonable preference or advantage." But Congress also unquestionably intended that telecommunications providers compete in a free marketplace and that consumers would have the protection of state consumer protection laws.[9]

---

[8] The only other case AT&T cites in which sections 201 and 202 were so interpreted, remarkably, predates even the existence of the 1934 FCA. *See W. Union Tel. Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 571, 41 S. Ct. 584, 65 L. Ed. 1094 (1921). In *Western Union*, the court interpreted analogous provisions of the Interstate Commerce Act of 1887, ch. 104, 24 Stat. 379, the precursor to the 1934 FCA. *W. Union*, 256 U.S. at 571. We decline to adopt an interpretation of a different statute in an entirely different historical context.

[9] Other statutory schemes are in accord. In *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 125 S. Ct. 1788, 161 L. Ed. 2d 687 (2005), the Court rejected an argument that pesticide manufacturers may not be sued for injuries under state law because the Environmental Protection Agency regulates pesticides:

> Dow and the United States greatly overstate the degree of uniformity and centralization that characterizes FIFRA [Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136-136y]. In fact, the statute authorizes a relatively decentralized scheme that preserves a broad role for state regulation . . . . A literal reading of § 136v(b) is fully consistent with the concurrent authority of the Federal and State Governments in this sphere.

*Id.* at 450-51 (citations omitted).

¶30 Senator Slade Gorton, then a senator from the state of Washington, succinctly summarized the goals of the FCA when he noted that the 1996 Telecommunications Act (permitting the FCC to cease enforcing section 203's tariffing requirement) would allow "[s]tates to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications service, and safeguard the rights of consumers, which are, of course, the precise goals of this Federal statute itself." 141 CONG. REC. S8206, S8212 (daily ed. June 13, 1995) (statement of Sen. Gorton).[10]

¶31 Setting aside its preemption argument, even AT&T concedes that state law now governs the formation of consumer long distance contracts. Br. of Appellant at 22-23. This is so because even the *Boomer* court recognized that, following detariffing, there appears to be some role for state law. *Boomer*, 309 F.3d at 423 (acknowledging that state law may determine whether a contract has been formed). But we find no persuasive support for *Boomer*'s argument that the role of state contract law is somehow limited to laws governing offer and acceptance. In *Marcus v. AT&T Corp.*, 138 F.3d 46, 54 (2d Cir. 1998), the court held that the communications act does not manifest a clear congressional intent to preempt state law prohibiting deceptive business practices, false advertising, or common law fraud. In interpreting the 1996 Telecommunications Act, the FCC has repeatedly referred to the role of state law and has not done so in limiting terms. *See, e.g., In re Policy & Rules Concerning the Interstate, Interexchange Marketplace, Implementa-*

---

[10] *See In re Policy & Rules Concerning the Interstate, Interexchange Marketplace, Implementation of Section 254(g) of the Commc'ns Act of 1934*, 11 F.C.C.R. 7,141, 7,161 (1996) (Notice of Proposed Rule Making) ("In addition, the absence of tariffs would eliminate possible invocation by carriers of the filed rate doctrine."); *In re Policy & Rules Concerning the Interstate, Interexchange Marketplace, Implementation of Section 254(g) of the Commc'ns Act of 1934*, 11 F.C.C.R. 20,730, 20,751 (2006) (Second Report and Order) ("Moreover, we note that in the absence of tariffs, consumers will be able to pursue remedies under state consumer protection and contract laws in a manner currently precluded by the 'filed-rate' doctrine.").

*tion of Section 254(g) of the Commc'ns Act of 1934,* 11 F.C.C.R. 20,730, 20,751 (1996) (Second Report and Order) (after detariffing, consumers will also "be able to pursue remedies under state consumer protection and contract laws" and carriers will be treated like all other businesses in unregulated markets); *In re Policy & Rules Concerning the Interstate, Interexchange Marketplace, Implementation of Section 254(g) of the Commc'ns Act of 1934,* 12 F.C.C.R. 15,014, 15,057 (1996) (Order on Reconsideration) (consumers will have remedies under state contract and consumer protection law regarding the "legal relationship" between carrier and consumer).

¶32 To summarize, in 1996, Congress made a paradigm shift from a monopolistic, tariffed-rate system to a competitive market. Congress's goal of ensuring that telecommunications carriers provide consumers with reasonable, fair, and nondiscriminatory rates, terms, and conditions in a competitive market is furthered by providing consumers the protections of state contract and consumer protection laws. AT&T seems aghast that it may have to comply with the laws of 50 different states, but that is precisely what every other company that competes in a free, competitive, and open market must do. There is nothing in the 1996 Telecommunications Act that declares preemption or dictates that all contracts must be identical or uniform. 47 U.S.C. §§ 201, 202. Nothing prevents AT&T from creating new consumer services agreements with fair and reasonable terms that are consistent with the state laws in each state or all states in which it operates. Congress contemplated concurrent authority between federal and state authorities. State and private remedies aid rather than hinder the goal of preventing unjust or unreasonable discrimination.[11] We hold that the FCA does not preempt

---

[11] Although Congress has shifted from a monopolistic to a deregulated free market approach, AT&T continues to cling to its monopolistic cloak for protection. While we do not prejudge this case, if collecting taxes by zip code instead of by geography is good enough for monopoly work but not good enough for competitive market work, such practices might prove the wisdom of Congress in moving to a competitive market. We do not mean to focus on AT&T. We note that those

application of Washington law as to the validity of the contract.

## FAA PREEMPTION

¶33 AT&T also argues preemption under the FAA. As a preliminary matter, we reject AT&T's argument that unconscionability should be decided by the arbitrator under the FAA and *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006). In *Buckeye*, the plaintiff argued that the illegal interest rate provided for in the contract voided the entire contract, including the arbitration clause. *Id.* at 443-44. There was no argument that the arbitration clause itself was unconscionable or illegal. The Court held that when a party claims the contract as a whole is illegal, but does not specifically challenge the arbitration clause, the arbitrator should decide whether the contract is illegal. *Id.* at 449. The Court did not change the rule that when the validity of the arbitration agreement itself is at issue, the courts must first determine whether there was a valid agreement to arbitrate. *Id.* at 445. That rule applies here because the challenges McKee raises with regard to the AT&T Consumer Services Agreement relate only and specifically to the dispute resolution and arbitration section. *See Preston v. Ferrer*, ___ U.S. ___, 128 S. Ct. 978, 984, 169 L. Ed. 2d 917 (2008) (Court compelled arbitration under *Buckeye* because there was no discrete challenge to the arbitration clause in

---

companies who were eager to set aside the monopolistic model in favor of a free market so they could enter the telecommunications market are also eager to cloak themselves in the same monopolistic privileges they once sought to render from AT&T. *See, e.g., Sprint Telephony PCS, LP v. County of San Diego*, 490 F.3d 700 (9th Cir. 2007); *Fisher*, 495 F.3d 1052; *Pinney v. Nokia, Inc.*, 402 F.3d 430 (4th Cir. 2005); *Dreamscape Design, Inc. v. Affinity Network, Inc.*, 414 F.3d 665 (7th Cir. 2005); *Fedor v. Cingular Wireless Corp.*, 355 F.3d 1069 (7th Cir. 2004); *Sprint Spectrum LP v. Mills*, 283 F.3d 404 (2d Cir. 2002); *In re Wireless Tel. Radio Frequency Emissions Prods. Liability Litig.*, 327 F. Supp. 2d 554 (D. Md. 2004); *Russell v. Sprint Corp.*, 264 F. Supp. 2d 955 (D. Kan. 2003); *Threadgill v. Cingular Wireless, LLC*, 223 F. Supp. 2d 786 (E.D. Tex. 2002); *Aronson v. Sprint Spectrum, LP*, 90 F. Supp. 2d 662 (W.D. Pa. 2000); *Balthazar v. Verizon Hawaii, Inc.*, 109 Haw. 69, 123 P.3d 194 (2005).

the proceedings below); *Vasquez-Lopez v. Beneficial Or., Inc.*, 210 Or. App. 553, 565, 152 P.3d 940 (2007).

¶34 As in *Scott*, this challenge is not preempted by section 2 of the FAA. *Scott*, 160 Wn.2d at 858; 9 U.S.C. § 2. The FAA requires that we place arbitration agreements on the same footing as other contracts. *See, e.g., Doctor's Assocs.*, 517 U.S. at 687. It does not require us to allow unconscionable restrictions on arbitration that are essentially exculpatory clauses in disguise. The FAA does not require us to uphold a class action waiver merely because it is embedded in an arbitration agreement. *See Scott*, 160 Wn.2d at 858. Like any other contract, an arbitration agreement may be substantively unconscionable when it is used as a tool of oppression to prevent vindication of small but widespread claims. *See, e.g., id.* at 858-59; *Luna*, 236 F. Supp. 2d at 1179 (citing *Mendez v. Palm Harbor Homes, Inc.*, 111 Wn. App. 446, 465, 45 P.3d 594 (2002)).

¶35 As we said in *Scott*, class action waiver has nothing to do with a valid agreement to arbitrate. Class actions are often arbitrated. *See Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 453, 123 S. Ct. 2402, 156 L. Ed. 2d 414 (2003). Class actions actually promote the prime objective of an agreement to arbitrate, which is " 'streamlined proceedings and expeditious results.' " *Preston*, 128 S. Ct. at 986 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 633, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)). Similarly, arbitrations can (and often should) be conducted openly and without secrecy, apply appropriate statutes of limitations, award damages (both compensatory and punitive), and award attorney fees. Limiting consumers' rights to open hearings, shortening statutes of limitations, limiting damages, and awarding attorney fees have absolutely nothing to do with resolving a dispute by arbitration. Courts will not be so easily deceived by the unilateral stripping away of protections and remedies merely because provisions are disguised as arbitration clauses. The FAA does not require enforcement of unconscionable contract provisions. We adhere to our decision in *Scott* and hold

that the FAA does not preempt application of Washington consumer protection law.

## SUBSTANTIVE UNCONSCIONABILITY

¶36 Although states may not refuse to enforce arbitration agreements based upon state laws that apply only to such agreements, "generally applicable contract defenses, such as fraud, duress, or unconscionability" may be applied. *Doctor's Assocs.*, 517 U.S. at 687. Whether an agreement is unconscionable is a question of law for the courts. *Nelson*, 127 Wn.2d at 131. Agreements may be either substantively or procedurally unconscionable. *Zuver*, 153 Wn.2d at 303. Substantive unconscionability involves those cases where a clause or term in the contract is one-sided or overly harsh. *Id.* Substantive unconscionability alone is sufficient to support a finding of unconscionability. *Adler*, 153 Wn.2d at 346-47. Here, the agreement to arbitrate is included in a section of the agreement entitled "Dispute Resolution." CP at 718-19. That section, and the rest of the agreement, contains several clauses limiting the nature of the relief available in arbitration.

### A. *Class Action Waiver*

¶37 This issue was largely, but not entirely, decided by *Scott. Scott*, 160 Wn.2d at 847. In *Scott*, we held that a class action waiver in an arbitration agreement was substantively unconscionable. *Id.* In so holding, we relied on several crucial facts. First, the individual claims at issue were very small (between $1 and around $45 per month), but the plaintiffs alleged that in the aggregate, Cingular had overcharged the public very large sums of money. *Id.* at 847-48. We found that without class action suits, the public's ability to act as " 'private attorneys general,' " as intended in the Consumer Protection Act, was eviscerated. *Id.* at 854. We therefore concluded the class action waiver was unconscionably in violation of public policy. *Id.*

¶38 We also found the agreement substantively unconscionable because it effectively, if not explicitly, exculpated Cingular for potentially widespread misconduct. *Id.* at 855. We found that when wrongs are small but widespread, class actions are often the only effective way to address them. *Id.* We rejected Cingular's argument that relief was practically available because it promised to pay the costs of individual arbitration and because attorney fees could be awarded to the prevailing party. *Id.* at 856. We cited the evidence that no attorney would be willing to undertake individual arbitration to recover the trivial amounts of money at stake in an individual claim. *Id.* We also noted that small claims court was not an effective remedy because the amounts at issue were too small to be worth the time and energy, let alone the nominal filing fee. *Id.* We were concerned that without class actions, many consumers might not even know they had a claim. *Id.* at 855.

¶39 As in *Scott*, the contract now before us is a contract for consumer services, and the individual claims here are extremely small, under $2 per month. Without access to class-wide relief, competent counsel would not be available to redress many meritorious claims. *See* CP at 566-69. The agreement allows for small claims court actions, but even the availability of small claims court or low-cost arbitration does not make it practicable for an individual to pursue such small amounts. *See Scott*, 160 Wn.2d at 855-56. Indeed, this agreement is less favorable to consumers than the one we struck down in *Scott*. Cingular's agreement at issue in *Scott* provided that Cingular would pay the attorney fees for a prevailing consumer. *Id.* at 856. Here, not only does AT&T not pay the consumer's attorney fees, the agreement prohibits the arbitrator from awarding them unless specifically provided for in a statute. Because the class action waiver in this case is not meaningfully different from the one we held substantively unconscionable in *Scott*,

we hold that the class action waiver in the AT&T agreement before us is unconscionable.[12]

## B. *Confidentiality*

■■ ■■ ¶40 A confidentiality clause in a contract of adhesion is a one-sided provision designed to disadvantage claimants and may even help conceal consumer fraud. Confidentiality unreasonably favors repeat players such as AT&T. *See Ting*, 319 F.3d at 1151-52; *Luna*, 236 F. Supp. 2d at 1180; *Zuver*, 153 Wn.2d at 312-15. Secrecy conceals any patterns of illegal or abusive practices. It hampers plaintiffs in learning about potentially meritorious claims and serves no purpose other than to tilt the scales in favor of AT&T. *See Zuver*, 153 Wn.2d at 313-14. It ensures that AT&T will " 'accumulate[ ] a wealth of knowledge' " about arbitrators, legal issues, and tactics. *Id.* at 312-13 (quoting *Ting*, 319 F.3d at 1152). Meanwhile, consumers are prevented from sharing discovery, fact patterns, or even work product, such as briefing, forcing them to reinvent the wheel in each and every claim, no matter how similar.

¶41 Washington has a strong policy that justice should be administered openly and publicly. *See Dreiling v. Jain*, 151 Wn.2d 900, 908, 93 P.3d 861 (2004) (discussing sealed court records). Under our constitution, "[j]ustice in all cases shall be administered openly." CONST. art. I, § 10. Secrecy breeds mistrust and, potentially, misuse of power. *Dreiling*, 151 Wn.2d at 908. Whether in regard to improper utility

---

[12] Our conclusion in *Scott* has been bolstered by other courts that have affirmed our holding or that have independently come to the same conclusion. For example, Judge Gould, writing for the Ninth Circuit, recently applied *Scott* to invalidate a class action waiver in *Lowden v. T-Mobile USA, Inc.*, 512 F.3d 1213 (9th Cir. 2008). The court affirmed the district judge's denial of T-Mobile's motion to compel arbitration. *Id.* at 1214-15. Several other courts have also found class action waivers are substantively unconscionable in consumer contracts when the costs of pursuing the claim far outweigh the amount in controversy. *See, e.g., Ting*, 319 F.3d at 1151; *Luna*, 236 F. Supp. 2d at 1178; *Wigginton v. Dell, Inc.*, 382 Ill. App. 3d 1189, 1196-97, 890 N.E.2d 541, 321 Ill. Dec. 819 (2008); *Whitney v. Alltel Commc'ns, Inc.*, 173 S.W.3d 300, 313-14 (Mo. App. 2005); *Fiser v. Dell Computer Corp.*, 2008-NMSC-46, ¶ 25, 144 N.M. 464, 188 P.3d 1215; *Vasquez-Lopez*, 210 Or. App. at 570; *Coady v. Cross Country Bank, Inc.*, 2007 WI App 26, ¶ 50, 299 Wis. 2d 420, 729 N.W.2d 732.

surcharges or unreasonably dangerous products, consumer adhesion contracts that require secrecy violate this important public policy. We hold that the confidentiality provision before us is substantively unconscionable.

## C. *Statute of Limitations*

¶42 Generally, parties can shorten the applicable statute of limitations by contract unless a shorter time frame is unreasonable or prohibited by statute or public policy. *Adler*, 153 Wn.2d at 356. But such a limitation is harsh and one-sided when imposed on a consumer in a contract of adhesion for a basic consumer service such as long distance telephone service. It is for these consumer service agreements that Washington's Consumer Protection Act is designed to provide protection. RCW 19.86.920 (purpose of act is to "protect the public and foster fair and honest competition"); *see also Scott*, 160 Wn.2d at 853. The Washington Consumer Protection Act provides a four year statute of limitations, but AT&T's agreement cuts that period in half. RCW 19.86.120; CP at 719. The four year statute of limitations permits adequate time for consumers to vindicate rights violated by unfair business practices. The act would be meaningless if consumer contracts of adhesion routinely stripped consumers of their remedies under the Consumer Protection Act; "consumers would have far less ability to vindicate" their rights under the act. *Scott*, 160 Wn.2d at 854. We hold AT&T's limitation on actions is substantively unconscionable as against public policy as to Consumer Protection Act claims. *See id.* at 851-53.

## D. *Limit on Attorney Fees*

¶43 The AT&T Consumer Services Agreement is completely lopsided on the issue of attorney fees. AT&T has not hesitated to give itself the advantage of collecting its attorney fees as one of its remedies. Section 2(e) of the agreement, entitled "**SUSPENDING AND CANCELLING THE SERVICES**," provides in part, "Subject to Section 7,

you must reimburse us for any reasonable costs we incur, including attorneys' fees, to collect charges owed to us." CP at 718. Section 3, entitled "**INDEMNIFICATION**," provides in part, "**YOU AGREE TO REIMBURSE US FOR ALL COSTS AND EXPENSES RELATED TO THE DEFENSE OF ANY SUCH CLAIMS, INCLUDING ATTORNEYS' FEES**." *Id.* However, section 7(a) provides that any claim by the customer must be submitted to arbitration and limits the remedies available: "**THE ARBITRATOR MAY NOT AWARD DAMAGES THAT ARE NOT EXPRESSLY AUTHORIZED BY THIS AGREEMENT AND MAY NOT AWARD PUNITIVE DAMAGES OR ATTORNEYS' FEES UNLESS SUCH DAMAGES ARE EXPRESSLY AUTHORIZED BY A STATUTE**." *Id.*

¶44 Section 7 contravenes the policy of this state. Washington follows the American rule, and each party is expected to pay the party's own attorney fees unless otherwise provided by statute or contract. *Cosmopolitan Eng'g Group, Inc. v. Ondeo Degremont, Inc.*, 159 Wn.2d 292, 303, 149 P.3d 666 (2006). When one party to a contract seeks to impose a unilateral attorney fee provision by contract, Washington's policy, by statute, is to convert the unilateral provision into a reciprocal contractual provision that applies equally to all parties to the contract. RCW 4.84.330. Further Washington's Consumer Protection Act provides for attorney fees for consumers who successfully challenge unfair acts and practices. RCW 19.86.090. AT&T's provision limiting attorney fees is unconscionable under *Scott*. We found that even if attorney fees might be awarded to a prevailing consumer, the risk was still too great to make relief meaningfully available. *Scott*, 160 Wn.2d at 856. If an arbitrator awarded even one cent less than the amount the consumer requested (which arbitrators often do in attempting to find a compromise), the attorney fees would not be available. *Id.* Here, the agreement purports to prohibit the arbitrator from awarding attorney fees unless expressly provided for in a statute. CP at 718. We hold the limit on attorney fees is also substantively unconscionable.

## E. *Limit on Punitive Damages*

¶45 As described above, section 7 prohibits an arbitrator from awarding punitive damages unless expressly authorized by statute. The trial judge concluded that this provision was substantively unconscionable. However, Washington is one of only a few states that does not provide generally for punitive damages for particularly egregious conduct. *Dailey v. N. Coast Life Ins. Co.*, 129 Wn.2d 572, 575, 919 P.2d 589 (1996); *see also, e.g.*, Annotation *Allowance of Punitive Damages in Products Liability Case*, 13 A.L.R. 4TH 52 (1982). Washington does provide a few limited examples of exemplary damages. The relevant example is the Consumer Protection Act, which provides "treble" damages upon appropriate findings. RCW 19.86-.090. We say limited because in the instant case, the damages sought are $2 per month; under Washington's Consumer Protection Act, a prevailing consumer might be awarded up to $6 per month. The agreement permits punitive damages "expressly authorized by a statute." CP at 718. Because Washington provides for limited examples of exemplary damages and each example is specifically authorized by statute, we do not read AT&T's Consumer Services Agreement to limit the availability of punitive damages in Washington State. We hold the limitation on punitive damages is not unconscionable.

### PROCEDURAL UNCONSCIONABILITY

¶46 The trial judge found AT&T's Consumer Services Agreement both substantively and procedurally unconscionable. McKee was not provided with a copy of any agreement at the time he signed up for AT&T services. Even when a consumer contracts for a service electronically, the consumer has an opportunity to review the contract and is given the choice to "agree" before the contract is formed. *See, e.g.*, *Koresko v. RealNetworks, Inc.*, 291 F. Supp. 2d 1157, 1163 (E.D. Cal. 2003) (describing electronic

"clickwrap" agreements). AT&T apparently mailed the terms and conditions to McKee 10 days to two weeks after he subscribed for service. AT&T retained the right to unilaterally change the contract by posting the change on its web site or by mailing the notice of the change. A consumer was deemed to have agreed to the changes by continuing to use AT&T service whether the consumer had actual notice of the change or not.[13] At no time was the consumer required to read and sign or affirmatively acknowledge acceptance of the terms and conditions. These facts raise an issue of whether McKee had a reasonable opportunity to understand the terms and a meaningful choice. *See Zuver*, 153 Wn.2d at 304. However, having held below that the entire dispute resolution provision is substantively unconscionable, we find it unnecessary to reach the issue of procedural unconscionability.

SEVERABILITY

¶47 The trial judge concluded these unconscionable provisions permeate the entire arbitration agreement and thus cannot be severed. Each provision discussed above magnifies the exculpatory effect of the arbitration agreement. These unconscionable provisions operate in concert to eliminate any realistic possibility of relief for consumers with small claims such as McKee's. We affirm Judge Bridges's conclusion that severance is not possible because the four unconscionable terms pervade the dispute resolution section of the agreement. AT&T would have us strike the unconscionable provisions from the dispute resolution section and enforce the rest of the dispute resolution section. However, when unconscionable provisions so permeate an agreement, we strike the entire section or contract. *See id.* at 320 (quoting *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1180 (9th Cir. 2003); *Alexander v. Anthony Int'l, LP*, 341 F.3d 256, 271 (3d Cir. 2003)). Here,

---

[13] It is troubling that the contract was amended so often that even AT&T has had difficulty determining which contract terms applied to McKee.

we are faced with four different unconscionable terms and we find that they taint the entire dispute resolution section, such that severance would essentially require us to rewrite the dispute resolution agreement. *See Ingle*, 328 F.3d at 1180.

¶48 Permitting severability as requested by AT&T in the face of a contract that is permeated with unconscionability only encourages those who draft contracts of adhesion to overreach. If the worst that can happen is the offensive provisions are severed and the balance enforced, the dominant party has nothing to lose by inserting one-sided, unconscionable provisions.

¶49 Although we find that the entire dispute resolution section must be stricken because the unconscionable terms are inextricable without rewriting the agreement, we find that this effect does not extend to the rest of the Consumer Services Agreement. Section 8 of the Consumer Services Agreement provides for severability: "**e. Separability.** If any part of this Agreement is found invalid, the rest of the Agreement will remain valid and enforceable." CP at 719. We give effect to severability clauses if we can easily excise the unconscionable provision without essentially rewriting the contract. *See Zuver*, 153 Wn.2d at 320 (quoting *Ingle*, 328 F.3d at 1180). We find that having excised the dispute resolution provision as unconscionable, the balance of the agreement stands on its own. We hold that the balance of the agreement is enforceable subject to this opinion.[14]

---

[14] *See Lowden*, 512 F.3d 1213. In *Lowden*, the district judge observed that *Scott v. Cingular Wireless* was pending before the Washington Supreme Court but declined to stay her ruling pending *Scott*. *Id.* at 1216-17. She concluded that T-Mobile's prohibition on class relief and limitations on punitive damages and attorney fees were substantively unconscionable and declared the entire arbitration agreement to be unenforceable, despite severability provisions. *Id.* at 1217; *see also Lowden v. T-Mobile*, No. C05-1482P, 2006 U.S. Dist. LEXIS 94861, at *27-29 (W.D. Wash. Apr. 13, 2006). The Ninth Circuit Court of Appeals affirmed. *Lowden*, 512 F.3d at 1214-15.

CONCLUSION

¶50 Courts, not arbitrators, decide the validity of arbitration agreements. *Buckeye*, 546 U.S. at 445. Applying choice of law principles, Washington law applies to this contract dispute. Washington consumer protection law and Washington law relating to the formation of contracts are not preempted by either the FCA or the FAA. The AT&T Consumer Services Agreement before us is a contract of adhesion. AT&T's Consumer Services Agreement is substantively unconscionable and therefore unenforceable to the extent that it purports to waive the right to class actions, require confidentiality, shorten the Washington Consumer Protection Act statute of limitations, and limit availability of attorney fees. We emphasize that these provisions have nothing to do with arbitration. Arbitrators supervise class actions, conduct open hearings, apply appropriate statutes of limitations, and award compensatory and punitive damages, as well as attorney fees, where appropriate. Courts will not be easily deceived by attempts to unilaterally strip away consumer protections and remedies by efforts to cloak the waiver of important rights under an arbitration clause. The dispute resolution section is severable from the balance of the contract. We affirm the trial court in all respects unless otherwise noted and remand for further proceedings consistent with this opinion.

ALEXANDER, C.J.; C. JOHNSON, SANDERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ.; and ELLINGTON, J. PRO TEM., concur.

MADSEN, J., concurs in result only.

# ADDENDUM

AT&T Consumer Home

Enter Search, Term or AT&T Keyword:  [GO]

 **AT&T Consumer**

Consumer Service Guides Home | >Consumer Services Agreement | Domestic Service Guides |
International Service Guides | Miscellaneous Charges & Taxes | Recent Rate Changes | Tariff Information |
Consumer Service Guides Search | Glossary | Frequently Asked Questions

Agreement

## AT&T Consumer Services Agreement

**THANK YOU FOR USING AT&T SERVICES.** In this Agreement ("Agreement"), "you" and "your" mean the customer of the AT&T services defined below, and "AT&T," "we," "our," and "us" mean AT&T Corp., Alascom, Inc., and any AT&T affiliates authorized to provide you with AT&T services.

**BY ENROLLING IN, USING, OR PAYING FOR THE SERVICES, YOU AGREE TO THE PRICES, CHARGES, TERMS AND CONDITIONS IN THIS AGREEMENT. IF YOU DO NOT AGREE TO THESE PRICES, CHARGES, TERMS AND CONDITIONS, DO NOT USE THE SERVICES, AND CANCEL THE SERVICES IMMEDIATELY BY CALLING AT&T AT 1-888-288-4099\* FOR FURTHER DIRECTIONS.**

"Service" or "Services" means: (1) the AT&T state-to-state and international consumer telecommunications services you are enrolled in, use, or pay for that AT&T provided to you under tariffs filed with the Federal Communications Commission as of July 31, 2001; and (2) any new or additional AT&T state-to-state and international consumer telecommunications services that you enroll in, use, or pay for, after July 31, 2001.

This Agreement does not cover AT&T local services, AT&T in-state long distance services, calls made by dialing 10-10-345, AT&T Wireless Services, AT&T Internet services, and AT&T video services. The Services covered in this Agreement are subject to billing availability and may not be available at all locations.

"AT&T Service Guides" contain the specific prices and charges, service descriptions and other terms and conditions not set forth here that apply to each of your Services. You can review the AT&T Service Guides on our web site at http://web.archive.org/web/20011208114437/http://serviceguide.att.com/ACS/ext/ or request a copy of the AT&T Service Guides for the Services you are enrolled in by calling AT&T toll free at 1-888-288-4099.\* THIS AGREEMENT INCORPORATES BY REFERENCE THE PRICES, CHARGES, TERMS AND CONDITIONS INCLUDED IN THE AT&T SERVICE GUIDES.

## 1. CHARGES AND PAYMENT.

a. **General.** You agree to pay us for the Services at the prices and charges listed in the AT&T Service Guides. The prices and charges for any particular call may depend on a number of factors listed in the AT&T Service Guides, which include, for example, the duration of a call, the time of day and day of week, the distance called, and the type of service. Service types include, for example, direct-dialed from home, operator-assisted, or calling card calls. The prices and charges for the Services may also include, for example, monthly fees, monthly minimums, or connection charges.

b. **Price Changes.** We may change the prices and charges for the Services from time to time. We may decrease prices without providing advance notice. Increases to the prices or charges for the Services are effective no sooner than fifteen days after we post them on our web site at http://web.archive.org/web/20011208114437/http://serviceguide.att.com/ACS/ext/. Increases to charges that recover our costs associated with government programs are effective no sooner than three days after we post the increases on our web site (excluding taxes and surcharges under Section 1.e.). We will provide further notices of increases to the prices and charges as follows: For the Services covering direct-dialed calls from home under the state-to-state basic schedule and the state-to-state and international calling plans, we will (1) notify you of these increases by bill message or other notice; and (2) make available in advance recorded announcements of these price increases. These recordings can be obtained by calling AT&T toll free at 1-888-288-4099, 24 hours a day,

seven days a week, and will be updated on the first and fifteenth day of each month.

For the following types of calls, we will provide you the prices and charges if you request this information at the time you make a call (or at the time you receive a collect call): AT&T Calling Card calls; AT&T collect calls; AT&T person-to-person calls; calls made with a commercial credit card or local phone company calling card; calls billed to a third party; and other types of operator-assisted calls.

c. **Payments.** You must pay all bills or invoices on time (on or before the due date) and in U.S. money. We do not waive our right to collect the full amount due if you pay late or you pay part of the bill, even if you write the words "Paid in Full" (or similar words) on any correspondence to us.

If you make any late payments, and we bill you for the Services, we will charge you a late fee of 1.5%, which we apply to that period's charges and any outstanding charges and late payment charges that remain unpaid at the time of the next bill. If the state law where you receive the Services requires a different rate, we will apply that rate. If a local telephone company or other entity bills you for the Services on our behalf, that company's late payment charges and policies will apply.

If your check, bank draft or electronic funds transfer is returned for insufficient funds, and we bill you for the Services, we will charge you an additional $15. If the state law where you receive the Services requires a different fee, we will charge you that amount. If a local telephone company or other entity bills you for the Services on our behalf, that company's returned check charge and policy will apply. When payment is made by credit card, payment will also be subject to terms and conditions required by the credit card issuer.

d. **Charges and Billing.** Charges accrue through a full billing period. We may prorate or adjust a bill if the billing period covers less than or more than a full month. (For this purpose, each month is considered to have 30 days.) To determine the charge for each call, we round up to the next full minute for any fraction of minutes used. We will determine the format of the bill and the billing period, and we may change both the bill format and the billing period from time to time.

You are responsible for preventing the unauthorized use of the Services, and you are responsible for payment for any such unauthorized use.

e. **Taxes and Other Charges.** You must pay all taxes, fees, surcharges and other charges that we bill you for the Services, unless you can show documentation satisfactory to us that you are exempt. Taxes and surcharges will be in the amounts that federal, state and local authorities require us to bill you. We will not provide advance notice of changes to taxes and surcharges, except as required by applicable law.

f. **Credit Check and Deposits.** You give us permission to obtain your credit information from consumer credit reporting agencies at any time. If we bill you for the Services and we determine that you may be a credit risk for (1) unsatisfactory credit rating; (2) insufficient credit history; (3) fraudulent or abusive use of any AT&T services within the last five years; or (4) late payments for current or prior bills, we may require a deposit (or an advance payment as permitted by state law) to ensure payment for the Services. The amount of the deposit will be no more than any estimated one-time charges required for the Services, plus three months of the estimated average per-minute charges and/or monthly fees for the Services. We will pay simple interest at the annual rate of 4% on the deposit, subject to the state law where you receive the Services. If you fail to pay for the Services when due, we may use the deposit without giving notice to you. If you pay undisputed bills by the due date for twelve consecutive billing months, we will credit the deposit to your account. If a credit balance remains on your account, we will refund or credit that amount.

g. **Credit Limits.** If we bill you for the Services, we may set a credit limit based on your payment history or your credit score from consumer credit reporting agencies. If we do this, we will notify you of your initial credit limit and all changes to your credit limit. If you exceed your credit limit, we will restrict your access to the Services, including direct-dialed, operator-assisted, and calls requiring a 900 or 976 prefix. Access to emergency services (9-1-1) will not be affected by this restriction. If you fail to make timely payments, we may also lower your credit limit.

## 2. SUSPENDING AND CANCELLING THE SERVICES.

a. **Your Cancellation of the Services.** If you use more than one Service, you may change or cancel individual Services by calling the AT&T customer service number on your AT&T bill, subject to the applicable terms and conditions in the AT&T Service Guides. This Agreement remains in effect for any Services that you continue to be enrolled in, use, or pay for. If you want to cancel all of the Services, discontinue your use of all the Services and call us toll free at 1-888-288-4099 for further instructions.

b. **Fraudulent Use.** You will not use the Services for any unlawful, abusive, or fraudulent purpose, including, for example, using the Services in a way that (1) interferes with our ability to provide Services to you or other customers; or (2) avoids your obligation to pay for the Services. If AT&T has reason to believe that you or someone else is abusing the Services or using them fraudulently or unlawfully, we can immediately suspend, restrict, or cancel the Services without advance notice.

c. **Failure to Pay.** Upon advance notice, we may suspend, restrict, or cancel the Services and this Agreement, if you do not make payments for current or prior bills by the required due date, including payments for late fees or any other required additional charges.

d. **Other.** AT&T may from time to time discontinue certain Services, subject to applicable law and regulation.

e. **Outstanding Charges.** If Services are suspended, restricted, or cancelled, any charges will accrue through the date that AT&T fully processes the suspension, restriction or cancellation. You must pay all outstanding charges for these Services, including payment of any bills that remain due after the date of cancellation. Subject to Section 7, you must reimburse us for any reasonable costs we incur, including attorneys' fees, to collect charges owed to us. If you want us to renew the Services, we may require that you pay a deposit.

## 3. INDEMNIFICATION.

YOU AGREE THAT WE SHOULD NOT BE RESPONSIBLE FOR ANY THIRD-PARTY CLAIMS AGAINST US THAT ARISE FROM YOUR USE OF THE SERVICES. FURTHER, YOU AGREE TO REIMBURSE US FOR ALL COSTS AND EXPENSES RELATED TO THE DEFENSE OF ANY SUCH CLAIMS, INCLUDING ATTORNEYS' FEES, UNLESS SUCH CLAIMS ARE BASED ON OUR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. THIS *PROVISION WILL CONTINUE TO APPLY AFTER THE AGREEMENT ENDS.*

## 4. LIMITATIONS OF LIABILITY.

THIS SECTION DESCRIBES THE FULL EXTENT OF OUR RESPONSIBILITY FOR ANY CLAIMS YOU MAKE FOR DAMAGES CAUSED BY THE FAILURE OF THE SERVICES, OR ANY OTHER CLAIMS IN CONNECTION WITH THE SERVICES OR THIS AGREEMENT.

IF OUR NEGLIGENCE CAUSES DAMAGE TO PERSON OR PROPERTY, WE WILL BE LIABLE FOR NO MORE THAN THE AMOUNT OF DIRECT DAMAGES TO THE PERSON OR PROPERTY. FOR ANY OTHER CLAIM, WE WILL NOT BE LIABLE FOR MORE THAN THE AMOUNT OF OUR CHARGES FOR THE SERVICES DURING THE AFFECTED PERIOD. FOR ALL CLAIMS, WE WILL NOT BE LIABLE FOR INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS OR REVENUE OR INCREASED COSTS OF OPERATION. WE ALSO WILL NOT BE LIABLE FOR PUNITIVE, RELIANCE OR SPECIAL DAMAGES. THESE LIMITATIONS APPLY EVEN IF THE DAMAGES WERE FORESEEABLE OR WE WERE TOLD THEY WERE POSSIBLE, AND THEY APPLY WHETHER THE CLAIM IS BASED ON CONTRACT, TORT, STATUTE, FRAUD, MISREPRESENTATION, OR ANY OTHER LEGAL OR EQUITABLE THEORY.

WE WILL NOT BE LIABLE FOR ANY DAMAGES IF SERVICES ARE INTERRUPTED, OR THERE IS A PROBLEM WITH THE INTERCONNECTION OF OUR SERVICES WITH THE SERVICES OR EQUIPMENT OF SOME OTHER PARTY. THIS SECTION WILL CONTINUE TO APPLY AFTER THE AGREEMENT ENDS.

## 5. WARRANTIES.

EXCEPT AS THIS AGREEMENT EXPRESSLY STATES, WE MAKE NO EXPRESS WARRANTY REGARDING THE SERVICES AND DISCLAIM ANY IMPLIED WARRANTY, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. WE ALSO MAKE NO WARRANTY THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE. WE DO NOT AUTHORIZE ANYONE, INCLUDING, BUT NOT LIMITED TO, AT&T EMPLOYEES, AGENTS OR REPRESENTATIVES, TO MAKE A WARRANTY OF ANY KIND ON OUR BEHALF AND YOU SHOULD NOT RELY ON ANY SUCH STATEMENT.

## 6. CREDIT ALLOWANCES FOR INTERRUPTIONS.

If an interruption or failure of Services is caused solely by AT&T and not by you or a third party or other causes beyond our reasonable control, you may be entitled to a credit allowance as specified in the applicable AT&T Service Guide.

## 7. DISPUTE RESOLUTION.

IT IS IMPORTANT THAT YOU READ THIS ENTIRE SECTION CAREFULLY. THIS SECTION PROVIDES FOR RESOLUTION OF DISPUTES THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION. YOU CONTINUE TO HAVE CERTAIN RIGHTS TO OBTAIN RELIEF FROM A FEDERAL OR STATE REGULATORY AGENCY.

a. Binding Arbitration. The arbitration process established by this section is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16. You have the right to take any dispute that qualifies to small claims court rather than arbitration. All other disputes arising out of or related to this Agreement (whether based in contract, tort, statute, fraud, misrepresentation or any other legal or equitable theory) must be resolved by final and binding arbitration. This includes any dispute based on any product, service or advertising having a connection with this Agreement and any dispute not finally resolved by a small claims court. The arbitration will be conducted by one arbitrator using the procedures described by this Section 7. If any portion of this Dispute Resolution Section is determined to be unenforceable, then the remainder shall be given full force and effect.

The arbitration of any dispute involving $10,000 or less shall be conducted in accordance with the Consumer Arbitration Rules of the American Arbitration Association ("AAA"), as modified by this Agreement, which are in effect on the date a dispute is submitted to the AAA. The AAA's Commercial Arbitration Rules and fee schedules will apply to any disputes in excess of $10,000. You have the right to be represented by counsel in an arbitration. In conducting the arbitration and making any award, the arbitrator shall be bound by and strictly enforce the terms of this Agreement and may not limit, expand, or otherwise modify its terms.

NO DISPUTE MAY BE JOINED WITH ANOTHER LAWSUIT, OR IN AN ARBITRATION WITH A DISPUTE OF ANY OTHER PERSON, OR RESOLVED ON A CLASS-WIDE BASIS. THE ARBITRATOR MAY NOT AWARD DAMAGES THAT ARE NOT EXPRESSLY AUTHORIZED BY THIS AGREEMENT AND MAY NOT AWARD PUNITIVE DAMAGES OR ATTORNEYS' FEES UNLESS SUCH DAMAGES ARE EXPRESSLY AUTHORIZED BY A STATUTE. YOU AND AT&T BOTH WAIVE ANY CLAIMS FOR AN AWARD OF DAMAGES THAT ARE EXCLUDED UNDER THIS AGREEMENT.

b. Arbitration Information and Filing Procedures. Before you take a dispute to arbitration or to small claims court, you must first contact our customer account representatives at the customer service number on your AT&T bill for the Services, or write to us at AT&T, P.O. Box 944078, Maitland, Florida 32794-4078, and give us an opportunity to resolve the dispute. Similarly, before AT&T takes a dispute to arbitration, we must first attempt to resolve it by contacting you. If the dispute cannot be satisfactorily resolved within sixty days from the date you or AT&T is notified by the other of a dispute, then either party may then contact the AAA in writing at AAA Service Center, 134555 Noel Road, Suite 1750, Dallas, Texas 75240-6620 and request arbitration of the dispute. Information about the arbitration process and the AAA's Arbitration Rules and its fees are available from the AAA on the Internet at http://web.archive.org/web/20011208114437/http://www.adr.org/, or by contacting us at http://web.archive.org/web/20011208114437/http://serviceguide.att.com/ACS/ext/ or AT&T, P.O. Box 944078, Maitland, Florida 32794-4078. The arbitration will be based only on the written submissions of the parties and the documents submitted to the AAA relating to the dispute, unless either party requests that the arbitration be conducted using the AAA's telephonic, on-line, or in-person procedures. Additional charges may apply for these procedures. Any in-person arbitration will be conducted at a location that the AAA selects in the state of your primary residence. Any arbitration shall remain confidential. Neither you nor AT&T may disclose the existence, content or results of any arbitration or award, except as may be required by law, or to confirm and enforce an award.

ANY CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE BROUGHT WITHIN TWO YEARS AFTER THE DATE THE BASIS FOR THE CLAIM OR DISPUTE FIRST ARISES.

c. Fees and Expenses of Arbitration. You must pay the applicable AAA filing fee when you submit your written request for arbitration to the AAA. The AAA's filing fee and administrative expenses for a document arbitration will be allocated according to the AAA's Rules, except that for claims of less than $1,000, you will only be obligated to pay a filing fee of $20 and we will pay all of the AAA's other costs and fees. If you elect an arbitration process other than a document (or "desk") arbitration, you must pay your allocated share of any higher administrative fees and costs for the process you select. Unless applicable substantive law provides otherwise, each party will pay its own expenses to participate in the arbitration, including attorneys' fees and expenses for witnesses, document production and presentation of evidence. The prevailing party may, however, seek to recover the AAA's fees and the expenses of the arbitrator from the other party.

## 8. MISCELLANEOUS.

**a. No Third Party Rights.** This Agreement does not provide any third party with a remedy, claim, or right of reimbursement.

**b. Acts Beyond Our Control.** Neither you nor we will be responsible to the other for any delay, failure in performance, loss or damage due to fire, explosion, power blackout, earthquake, volcanic action, flood, the weather elements, strike, embargo, labor disputes, civil or military authority, war, acts of God, acts or omissions of carriers or suppliers, acts of regulatory or governmental agencies, or other causes beyond our reasonable control, except that you must pay for any Services used.

**c. Assignment.** We can assign all or part of our rights or duties under this Agreement without notifying you. If we do that, we have no further obligations to you. You may not assign this Agreement or the Services without our prior written consent.

**d. Notices.** Notices from you to AT&T must be provided as specified in this Agreement. Notice from you to AT&T made by calling AT&T is effective as of the date that our records show that we received your call.

AT&T's notice to you under this Agreement will be provided by one or more of the following: posting on our web site, recorded announcement, bill message, bill insert, newspaper ad, postcard, letter, call to your billed telephone number, or e-mail to an address provided by you.

**e. Separability.** If any part of this Agreement is found invalid, the rest of the Agreement will remain valid and enforceable.

**f. Governing Law.** This Agreement will be governed by the law of the State of New York, without regard to its choice of law rules, except that the arbitration provisions in Section 7 will be governed by the Federal Arbitration Act. This governing law provision applies no matter where you reside, or where you use or pay for the Services.

**g. Entire Agreement.** This Agreement (which incorporates by reference the AT&T Service Guides) constitutes the entire agreement between us and supersedes all prior agreements, understandings, statements or proposals, and representations, whether written or oral. This Agreement can be amended only as provided in Section 9 below. No written or oral statement, advertisement, or service description not expressly contained in the Agreement will be allowed to contradict, explain, or supplement it. Neither you nor AT&T is relying on any representations or statements by the other party or any other person that are not included in this Agreement.

## 9. CHANGES TO THIS AGREEMENT.

This Agreement may only be changed in the manner provided for in this Section 9. We may change this Agreement, including the incorporated AT&T Service Guides, from time to time. If we make any changes to the prices or charges, we will comply with our notice commitments described in Section 1 of this Agreement. With respect to all other changes to this Agreement, we will notify you of the changes, and they will be effective no sooner than fifteen days after we post them at
http://web.archive.org/web/20011208114437/http://serviceguide.att.com/ACS/ext/. You may also request a copy of the revised Agreement, including revised AT&T Service Guides for the services you are enrolled in, by calling AT&T toll free at 1-888-288-4099.

**IF YOU CONTINUE TO BE ENROLLED IN, USE, OR PAY FOR THE SERVICES AFTER ANY CHANGES IN THE PRICES, CHARGES, TERMS OR CONDITIONS, YOU AGREE TO THE CHANGES.**

## 10. ENROLLMENT IN ANOTHER AT&T SERVICE.

To enroll in an additional Service, or to switch from your existing Service to a different Service, you must notify us by: (1) returning an enrollment form provided in AT&T marketing materials; (2) calling the AT&T customer service number on your AT&T bill; (3) calling the AT&T customer service number provided in AT&T marketing materials; or (4) going to our web site at http://web.archive.org/web/20011208114437/http://www.att.com/ and following any further instructions provided for enrollment. The terms and conditions of this Agreement, including those in the incorporated AT&T Service Guides, will apply to the new or additional AT&T Service.

**BY ENROLLING IN, USING, OR PAYING FOR THESE NEW OR ADDITIONAL SERVICES, YOU AGREE TO THE PRICES, CHARGES, TERMS AND CONDITIONS IN THIS AGREEMENT.**

* Customers outside the U.S. call: 1-877-288-4725.

# 410

TTY for customers with hearing/speech disabilities: 1-800-833-3232.

Terms and Conditions  Privacy Policy.  Write to AT&T.
Copyright © 2001 AT&T  All rights reserved